[No. E041807. Fourth Dist., Div. Two. Apr. 29, 2008.]

AGNES H. EVERETT, Plaintiff and Appellant, v.
STATE FARM GENERAL INSURANCE COMPANY, Defendant and
Respondent.

**COUNSEL**

Law Offices of Christian J. Garris and Christian J. Garris for Plaintiff and Appellant.

Robie & Matthai, James R. Robie, Michael J. O'Neill, Natalie A. Kouyoumdjian; Hughes & Nunn and Randall M. Nunn for Defendant and Respondent.

## Opinion

**HOLLENHORST, Acting P. J.**—Agnes H. Everett (Everett) appeals after summary adjudication of issues and motion for judgment on the pleadings were granted in favor of defendant State Farm General Insurance Company (State Farm) in Everett's action, which alleged breach of contract, breach of the duty of good faith and fair dealing, promissory fraud, fraudulent misrepresentation, negligent misrepresentation, and reformation. We affirm.

### I. FACTS AND PROCEDURAL HISTORY

In October 1991, Everett purchased a home for approximately $99,000 located on Chiquita Lane in San Bernardino, California. At the same time, she purchased a homeowners policy from State Farm through agent Bryan Hendry (Hendry). The policy number was 75-BJ-7254-8. It was renewed annually on September 25. The policy included an endorsement for guaranteed replacement cost coverage, which provided that State Farm would pay the full amount needed to repair the damaged or destroyed dwelling with like or equivalent construction, without regard to the policy limits.

In August 1993, service of Everett's policy was transferred to agent Desiree Sarnowski (Sarnowski). Sarnowski did not inspect the property, nor did Everett request Sarnowski to inspect the property. Everett also never asked Sarnowski to review her policy or increase the limits.

In 1997, State Farm eliminated the guaranteed replacement cost coverage in its homeowners policies. To provide its insureds with ample warning, State Farm sent each policyholder a notice of the change in coverage. State Farm made certain its notice complied with applicable law. In the notice, State Farm informed its insureds that if they chose to renew their homeowners policies with State Farm, guaranteed replacement cost coverage would no longer be available. Portions of the notice contained red or boldfaced, large capital letters and informed insureds that the document was an "**IMPORTANT NOTICE . . . about changes to your policy**."[1] The notice further specified the changes to the policy in a second boldfaced, capitalized heading entitled, "**I. REDUCTIONS OR ELIMINATIONS OF COVERAGE.**" The insureds were notified that "**GUARANTEED EXTRA COVERAGE** (Current Homeowners Extra Form 5) and **GUARANTEED REPLACEMENT COST COVERAGE** (Current Endorsement to Homeowners Special Form 3)" were eliminated and that their policy "now has a stated limit of liability

---

[1] All boldface material and words that are in capital letters quoted in this opinion were in boldface or capital letters in the original notice. The words which are also underlined are the portions that were printed in red.

under Coverage A that reflects the maximum that will be paid in case of loss. If Option ID—Increased Dwelling Limit is shown in the Declarations of your new policy, it may provide an additional limit for damaged building structures. However, the most State Farm will pay for loss to property under Coverage A is the stated limit of liability, plus any additional limit provided by Option ID, if shown in the Declarations. The policy no longer provides a guarantee to replace your home regardless of the cost."[2]

Everett does not deny that she received this notice. Attached to the notice sent to her was a declarations page identifying the stated policy limits for the policy period 1997 through 1998. At the bottom of the declarations page was a bill for the premium for that policy period. On September 29, 1997, Everett accepted the homeowners policy with State Farm (under the new terms providing for a stated policy limit) when her premium for the policy period 1997 through 1998 was paid via a check from her impound account.

Each year from 2000 to 2003, State Farm sent a renewal certificate to Everett. The renewal certificate provided Everett with a yearly reminder that it was her responsibility to insure her home with adequate coverage. Thus, while State Farm provided Everett and other insureds with a replacement cost estimate, State Farm's renewal certificate was clear to explain that the amount of the estimate was just that—merely an estimate. The renewal certificate included the following: "The State Farm replacement cost is an estimated replacement cost based on general information about your home. It is developed from models that use cost of construction materials and labor rates for like homes in the area. The actual cost to replace your home may be significantly different. State Farm does not guarantee that this figure will represent the actual cost to replace your home. You are responsible for selecting the appropriate amount of coverage and you may obtain an appraisal or contractor estimate which State Farm will consider and accept, if reasonable. Higher coverage amounts may be selected and will result in higher premiums."

In addition to the annual renewal certificate, every two years State Farm mailed to its California insureds, including Everett, a "California Residential Property Insurance Disclosure." The disclosure was provided in compliance with Insurance Code section 10102. It explained the terms "replacement cost" and "extended replacement cost," as written by the Legislature. Extended replacement cost coverage was defined as the amount of replacement cost up to a specified amount above the policy limit.

On October 25, 2003, Everett's home was destroyed by fire. She submitted a claim to State Farm under her homeowners policy. One of the first tasks

---

[2] See appendix A, *post*, page 666, for the notice. The portions showing underline are those which were printed in red.

undertaken was to determine the scope of Everett's coverage. Her declarations page for the policy period of September 25, 2003, through September 24, 2004, provided that State Farm insured Everett's home under a homeowners policy, FP-7955-CA, with dwelling limits in the amount of $92,300, a dwelling extension limit in the amount of $9,230, and a personal property limit in the amount of $69,225. Her dwelling coverage was subject to a 20 percent (or $18,460) increase in contract limits under "Option ID"; it also provided "Ordinance/Law" coverage in the amount of $9,230.

The "Coverage A Loss Settlement Endorsement" incorporated into Everett's policy provided that State Farm "will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction . . . the damaged part of the property covered under **SECTION I—COVERAGES, COVERAGE A—DWELLING.**" State Farm adjusted Everett's claim and paid her $138,654.48 for her structural loss and $76,620 for her personal property. This amount took into account the increased sum under Everett's "Option ID" provision and the increase for inflation and "Ordinance/Law" coverage.

On March 25, 2005, Everett initiated this action against State Farm and its agent, Desiree Sarnowski,[3] asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, negligence, reformation, and fraud. Everett's contract claims were based on two theories. First, she alleged that the policy in effect at the time of her loss provided guaranteed replacement cost coverage such that she was entitled to full payment to replace her property without regard to policy limits. Alternatively, she alleged that State Farm failed to provide her with sufficient notice of the changes in her policy and thus her prior policy containing guaranteed replacement cost coverage should remain in effect.

On April 21, 2006, State Farm filed a motion for summary adjudication on the ground that Everett's policy, which was in effect at the time of her loss, did not include guaranteed replacement cost coverage. State Farm argued that Everett received sufficient notice about the change in her coverage with her 1997 renewal notice. Regarding her claim of bad faith, State Farm claimed there was no breach and thus no bad faith. Finally, State Farm argued that Everett's fraud-based claims were invalid because it never represented to her that her home was covered for up to 100 percent of the amount to replace her property.

On July 6, 2006, the trial court granted State Farm's motion for summary adjudication. Twenty days later, State Farm filed a motion for judgment on

---

[3] Everett dismissed the action, specifically the claim for professional negligence, as to Sarnowski on September 27, 2005.

the pleadings as to Everett's remaining claim for reformation. The motion was granted and judgment was entered in favor of State Farm on August 17.

On appeal, Everett contends the judgment must be reversed because (1) State Farm did not pay the policy limits on the code upgrade coverage, and (2) the policy, which promises to replace her home while stating a limit, is unclear.

## II. STANDARD OF REVIEW

### A. *Motion for Summary Adjudication.*

On appeal from a motion for summary judgment or summary adjudication of issues we conduct a de novo review of the record. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431].)

### B. *Motion for Judgment on the Pleadings.*

"The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer." (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1298 [38 Cal.Rptr.3d 316].) "On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, we give the complaint a reasonable interpretation, and treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. A trial court errs in sustaining a demurrer when the plaintiff has stated a cause of action under any possible legal theory, and abuses its discretion in sustaining a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 4–5 [86 Cal.Rptr.2d 73] (*Palm Springs Tennis Club*).) Still, the burden is on the appellant to demonstrate the existence of reversible error. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 626 [49 Cal.Rptr.2d 494].) Therefore we need only discuss whether a cause of action was stated under the theories raised on appeal. (*Ibid.*)

Further, "[w]hile a plaintiff need not request leave to amend in order to preserve on appeal the issue of whether the court abused its discretion in sustaining a demurrer without leave to amend (Code Civ. Proc., § 472c), on appeal the plaintiff does bear the burden of proving there is a reasonable possibility the defect in the pleading can be cured by amendment. [Citation.] ' ". . . Plaintiff must show in what manner he can amend his complaint and

how that amendment will change the legal effect of his pleading. . . ." [Citation.]' [Citation.]" (*Palm Springs Tennis Club, supra,* 73 Cal.App.4th at pp. 7–8.)

### III. MOTION FOR SUMMARY ADJUDICATION

A. *Interpretation of Everett's Policy.*

According to Everett, either her policy covered her loss in its entirety, or the policy was unclear. We begin our analysis by looking at the language in the policy.

■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) " 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' " (*Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 338 [57 Cal.Rptr.2d 755], quoting *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666–667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) "To yield their meaning, the provisions of a policy must be considered in their full context. [Citations.] Where it is clear, the language must be read accordingly. [Citations.] Where it is not, it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation [citations] and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations [citations]." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 45 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

■ " 'It is, of course, well established that an insurer has a right to limit the policy coverage in plain and understandable language, and is at liberty to limit the character and extent of the risk it undertakes to assume [citations].' [Citations.] It is likewise axiomatic that an insurance policy is but a contract and that like all other contracts, it must be construed from the language used; where, as here, its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties. [Citations.] [¶] Thus, courts may not rewrite the insurance contract or force a conclusion to exact liability where none was contemplated. [Citations.]" (*Hackethal v. National Casualty Co.* (1987) 189 Cal.App.3d 1102, 1109 [234 Cal.Rptr. 853].)

Here, State Farm's policy in effect at the time of Everett's loss provided for "Replacement Cost—Similar Construction" for her dwelling. More specifically, in the "COVERAGE A LOSS SETTLEMENT ENDORSEMENT,"

the policy provides that State Farm "will pay *up to the applicable limit of liability shown in the Declarations*, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under **SECTION I—COVERAGES, COVERAGE A—DWELLING.**" (Italics added.) The declarations page shows a limit of $92,300, plus "Option ID" or "Increase Dwlg Up to $18,460."

Everett acknowledges that the "Loss Settlement" section of the policy and the "FE-5363" endorsement state that the amount payable on a claim for the dwelling is determined solely by looking at the declarations page. However, she contends that the declarations page is inconsistent. She notes that the declarations page includes both a stated dollar amount of $92,300 and a statement for the loss settlement provision that the policy includes replacement cost with "Similar Construction." She argues, "In such a situation, it is quite reasonable for an insured to believe that State Farm would replace Everett's home with similar construction—something that State Farm has refused to do."

Moreover, Everett focuses on the policy's use of the word "replace" and argues, " 'Replace' means to restore to the state the property was in just prior to the fire. By no interpretation or reasoning can replace ever mean: 'We will pay you some money that may or may not be enough to rebuild your home.' " Everett contends that State Farm used the word "replace" to deceive its customers into thinking that they have one thing when in reality they have something else. More specifically, Everett argues, "The policy provides replacement cost coverage—i.e., the policy promised to replace Everett's home in the event of a total loss. Otherwise, the word 'replacement,' which appears in the policy would constitute a deceptive inducement to insureds." We disagree.

▉ To accept Everett's argument is to value one word over all of the others used in the policy. However, "[i]n construing the policy before us, it is not our function to select a particular definition of a single word and apply it without regard to other language in the policy. [Citation.] ' "Ambiguity is not necessarily to be found in the fact that a word or phrase isolated from its context is susceptible of more than one meaning." [Citation.]' [Citation.] An insurance policy must be interpreted as a whole and in context. [Citation.]" (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 454 [10 Cal.Rptr.3d 617].)

▉ Thus, moving beyond the single word "replace," we find the following language in the "LOSS SETTLEMENT" section under "A1—Replacement Cost Loss Settlement" dispositive. The language states: "Similar

Construction is replaced with the following: [¶] We will pay *up to the applicable limit of liability shown in the Declarations*, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under **SECTION I—COVERAGES, COVERAGE A—DWELLING**." (Italics added.) Even if the word "replace" is interpreted as restoring the property to its similar state prior to the fire, regardless of its use, the "COVERAGE A LOSS SETTLEMENT ENDORSEMENT" clearly and unequivocally limits payment to the amount stated in the declarations page. There is no ambiguity. Express coverage limitations must be respected. (*Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.* (1998) 66 Cal.App.4th 1080, 1086 [78 Cal.Rptr.2d 429].) Accordingly, contrary to Everett's claim, her policy does not entitle her to the total cost to replace her property irrespective of her policy limits.

■ Notwithstanding the above, State Farm explains the use of the term "replacement cost" is intended "to account for the shortfall in coverage that may result from rebuilding under a policy that only pays for 'actual cash value.' " According to State Farm, a general fire insurance policy provides for "actual cash value" coverage. (Ins. Code, § 2071.) However, the amount of "actual cash value" is based on the "fair market value [of the damaged property] at the time of destruction" (*Fire Ins. Exchange v. Superior Court, supra*, 116 Cal.App.4th at p. 462) which oftentimes is insufficient to repair or replace the property. (*Conway v. Farmers Home Mut. Ins. Co.* (1994) 26 Cal.App.4th 1185, 1189 [31 Cal.Rptr.2d 883].) Thus, " 'replacement cost' coverage . . . is intended to compensate the insured for the *shortfall* in coverage that results from rebuilding under a policy that pays only for actual cash value. [Citations.]" (*Fire Ins. Exchange,* at p. 462.)

Based on the above, we find that Everett's policy was not unclear, nor did it guarantee to cover her loss in its entirety.

### B. *Breach of Contract.*

#### 1. *Payment of code upgrades.*

Everett contends that, even if we reject her first argument and find that the declarations page sets the dollar limit on the amount State Farm must pay, we should still reverse the judgment because State Farm "did not actually pay the amount that even it contends are the policy limits." According to Everett, the "Option OL" code upgrade coverage stated an amount of $9,230. She claims that the cost of code upgrades for rebuilding her home exceeded $9,396; however, State Farm paid only $5,696. In response, State Farm acknowledges the "Option OL" code upgrade coverage but argues that Everett is "not

*automatically* entitled to the full policy limits" unless she establishes that "she has incurred (or will incur) the cost for code upgrades up to the policy limits for that coverage."

Here, State Farm notes that Everett has failed to offer any admissible evidence to support her claim that the cost of code upgrades to replace her home exceeded policy limits. Everett cites the declaration of Rob Rettig that was submitted in opposition to State Farm's motion for summary judgment, to which declaration State Farm objected. State Farm's objection was sustained.[4] Mr. Rettig is a general contractor, who opined that the cost of code upgrades for Everett's home "exceeds $9,396." However, Mr. Rettig offered no explanation as to how and why he reached this conclusion. Nor did he provide any documentation to support it. Rather, his opinion amounted to merely an estimate. As he noted, "There are several items which remain open at this time. They need to be addressed before final pricing for this residence can be completed: [¶] . . . [¶] Code Upgrades unless specifically noted herein."

Because Everett failed to show that she either incurred, or would incur, the cost for code upgrades up to the policy limits, this assertion does not support a claim for breach of contract.

### 2. *Payment to replace Everett's home.*

Citing *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 [55 Cal.Rptr.2d 276] (*Desai*), Everett contends that State Farm breached the contract of insurance by not paying to replace her home.

In *Desai*, an insured sued his real property insurer, Farmers Insurance Exchange (Farmers), and the agent for, inter alia, breach of contract. The insured claimed that the defendants failed and refused to provide him with the 100 percent replacement cost coverage which he had requested and which the agent had assured him he was getting. (*Desai, supra,* 47 Cal.App.4th at pp. 1114–1115.) The policy contained a " 'Value Protection Clause,' " which provided: " 'We [Farmers] may increase the limits of insurance to reflect changes in costs of construction and personal property values. Any such increase will be made on the renewal date of this policy or on the anniversary date of 3-year policies paid annually. If a Replacement Cost provision forms a part of this policy, we guarantee that the limits of insurance meet the replacement cost requirements.' " (*Id.* at p. 1116.) Additionally, Farmers

---

[4] Everett has not challenged the trial court's ruling in this appeal. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900–901 [122 Cal.Rptr.2d 802] [appellant bears the burden of establishing that the trial court abused its discretion in its ruling on admissibility of evidence].)

informed its policyholders: " 'Your policy contains a very important feature called Value Protection. Value Protection provides *automatic protection against inflation* so that the coverage amounts are increased as the costs of replacing your home or Personal Property increase. Value Protection *guarantees to meet all minimum insurance-to-replacement cost requirements* if any are present in your policy. Subject to the amount of your policy limits and all policy provisions, depreciation will not be applied to most building losses . . . . The enclosed premium notice includes the increased amounts of insurance and premium, based on the applicable indexes for your property and your area. If there has been no increase in amounts of insurance this is because the applicable indexes did not show an upward adjustment for this period.' (Italics added.)" (*Ibid.*) Although the Farmers policy also provided for a $150,000 liability cap, our colleagues in the Second District found that the inclusion of the value protection clause would lead an objectively reasonable insured layperson to believe that the policy guaranteed replacement coverage, regardless of the insurer's purported policy limits. (*Id.* at pp. 1117–1118.)

 Here, unlike the policy in *Desai, supra,* 47 Cal.App.4th at page 1117, Everett's policy does not include any language guaranteeing replacement cost coverage, nor does it make any "promises of automatic protection." Instead, Everett's policy expressly provides that State Farm will pay the reasonable cost to replace the damaged property up to the stated policy limits. Because State Farm did just that, Everett's assertion that State Farm failed to pay to replace her home does not support a claim for breach of contract.

### 3. *Failure to maintain policy limits equal to replacement costs.*

Referring to the statutorily mandated California Residential Property Insurance Disclosure statement (Ins. Code, §§ 10101, 10102), Everett claims that State Farm is liable for its failure to maintain her policy limits equal to replacement costs. We disagree.

 Insurance Code sections 10101 and 10102 do not require State Farm to set policy limits that equal the cost to replace the property. Nor is State Farm duty bound to set policy limits for insureds. It is up to the insured to determine whether he or she has sufficient coverage for his or her needs. In fact, the California Residential Property Insurance Disclosure statement provides that it is the insured's burden to obtain sufficient coverage: "To be eligible to recover [extended replacement cost coverage], you must insure the dwelling to its full replacement cost at the time the policy is issued, with possible periodic increases in the amount of coverage to adjust for inflation . . . ." (Stats. 2006, ch. 137, § 1.) Additionally, the insured "must notify the insurance company about any alterations that increase the value of the insured dwelling by a certain amount . . . ." (*Ibid.*)

Each year that Everett had her insurance with State Farm, State Farm sent renewal certificates. These certificates reminded Everett that the replacement cost figure identified by State Farm was merely an estimate, and that it was her responsibility to determine whether her property was adequately insured. Thus, contrary to Everett's contention that it was State Farm's duty to maintain policy limits equal to replacement cost, Everett bore such duty. Nothing in the record suggests that the original policy limits were insufficient to replace her home in 1991. Moreover, there is nothing in the record that shows Everett requested her policy limits to be increased since they were set in 1991. Accordingly, Everett's assertion that State Farm failed to maintain limits equal to replacement cost fails, and as such, does not support a claim for breach of contract.

### 4. *Failure to annually adjust the policy limits to keep up with inflation.*

Everett contends that because her policy includes the inflation coverage provision, she was led to believe that State Farm was ensuring that the policy continued to insure the home to 100 percent of its replacement cost. (*Desai, supra,* 47 Cal.App.4th at pp. 1117–1118.)

According to Everett's policy, the inflation coverage provision states: "The limits of liability shown in the declarations for Coverage A, Coverage B and, when applicable, Option ID will be increased at the same rate as the increase in the Inflation Coverage Index shown in the Declarations. [¶] To find the limits on a given date: [¶] 1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then [¶] 2. multiply the resulting factor by the limits of liability for Coverage A, Coverage B and Option ID separately. [¶] The limits of liability will not be reduced to less than the amounts shown in the Declarations. [¶] If during the term of this policy the Coverage A limit of liability is changed at your request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change."

Contrary to Everett's claim, there is nothing in the above language, or her policy taken as a whole, that supports a finding that the inflation coverage provision leads an insured to believe that the policy provides for 100 percent replacement cost. Moreover, in light of the facts that the policy recognizes an insured may request a higher limit of liability, and the California Residential Property Insurance Disclosure statement places the burden of determining the higher limit of liability needed on the insured, Everett's assertion that State Farm failed to annually adjust the policy limits to keep up with inflation does not support a claim for breach of contract.

## C. *Acts of State Farm's Agents.*

Everett contends that State Farm agent Hendry, who sold the insurance policy to her, and State Farm agent Sarnowski, who later was responsible for maintaining the coverage, negligently represented that "State Farm would replace Everett's home in the event of a total loss, which is consistent with the policy language that the limit for the dwelling is 'Replacement Cost—Similar Construction.' "

When Everett first applied for insurance with State Farm, in October 1991, she did have guaranteed replacement cost coverage. However, in 1997, State Farm eliminated guaranteed replacement cost coverage. At that time, Everett was sent notice. Specifically, the notice stated: "**IMPORTANT NOTICE . . . about changes to your policy.**" It further informed her that the guaranteed replacement cost coverage was being eliminated and that her policy "now has a stated limit of liability under Coverage A that reflects the maximum that will be paid in case of loss. . . . The policy no longer provides a guarantee to replace your home regardless of the cost." Thus, beginning with the policy period that started in September 1997, Everett's policy no longer provided guaranteed replacement cost coverage.

Nonetheless, Everett claims that both agents misrepresented the extent of her coverage. In August 1993, service of Everett's policy was transferred to Sarnowski. Sarnowski did not inspect the property, nor did Everett request Sarnowski to inspect the property. Everett also never asked Sarnowski to review her policy or increase the limits. By 1997, when State Farm eliminated guaranteed replacement cost coverage, the only State Farm agent assigned to service Everett's policy was Sarnowski. Upon receiving notice of the change in coverage, Everett did not contact Sarnowski to inquire as to whether or not her policy still provided sufficient coverage. Instead, she accepted the change when her premium for the policy period 1997 through 1998 was paid via a check from her impound account.

Even if we were to assume there was some type of communication between Everett and Sarnowski, as State Farm points out, Everett's policy included an integration clause that provided the policy "contains all of the agreements between you and us and any of our agents." (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433–1434 [7 Cal.Rptr.2d 718] [oral agreement that predates integrated written agreement is merged into written agreement].) The policy stated that its terms could not be modified by any oral agreement. Also, the policy stated that any "waiver or change of any provision of [the] policy must be in writing by [State Farm] to be valid." (*EPA Real Estate Partnership v. Kang* (1992) 12 Cal.App.4th 171, 175 [15 Cal.Rptr.2d 209] ["when the parties intend a written agreement to be

the final and complete expression of their understanding, that writing becomes the final contract between the parties"].) Accordingly, no alleged oral representation could have been effective to change the terms of the fully integrated policy.

### D. *Insurance Code section 678.*

As another basis for her claim for breach of contract, Everett alleges that State Farm failed to provide adequate notice of the reduction in her insurance coverage pursuant to Insurance Code section 678. She argues that "since [she] was not adequately advised of any reduction in coverage, the original language remains in effect."

■ Insurance Code section 678, subdivision (a)(1)(A), provides: "At least 45 days prior to policy expiration, an insurer shall deliver to the named insured or mail to the named insured at the address shown in the policy, . . . [¶] (1) An offer of renewal of the policy . . . stating . . . [¶] (A) Any reduction of limits or elimination of coverage." This section requires that the insurer's notice on renewal of changes in coverage or limits be provided in a "plain, clear and conspicuous writing." (*Fields v. Blue Shield of California* (1985) 163 Cal.App.3d 570, 583 [209 Cal.Rptr. 781].)

Here, State Farm provided Everett with more than sufficient notice of the changes in her policy. According to the record, State Farm mailed to its insureds, including Everett, a notice informing them of the reduction in coverage. Specifically, the notice informed Everett that the "Guaranteed Replacement Cost Coverage" was being eliminated. Nonetheless, Everett maintains that the notice failed to "clearly explain" that there was a limit on the amount of coverage. We disagree. The notice stated: "Your policy now has a stated limit of liability under Coverage A that reflects the maximum that will be paid in case of loss." If Everett did not understand what was being changed with respect to her coverage, she could have called her agent, or State Farm directly, for clarification. She did not do so. Based on the above, Everett's assertion that she did not get sufficient notification of the changes in her policy fails.

### E. *Breach of Implied Covenant of Good Faith and Fair Dealing.*

Everett claims that "State Farm acted in bad faith by unreasonably withholding benefits." However, we have found that State Farm paid all benefits to which Everett was entitled under her policy. Because there was no breach of contract, there was no breach of the implied covenant. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619] [without coverage there can be no liability for bad faith on the part of the insurer].) Accordingly, summary judgment as to this cause of action was proper.

### F. *Fraud and Negligent Misrepresentation.*

According to Everett, State Farm "deceived her into thinking that she had one thing, and now State Farm argues that she had something else." As with her previous claims, Everett argues that when she first purchased her insurance policy, she was told that she had full replacement cost. However, when her home burned down, she was not compensated for her entire loss. Thus, she maintains that whether State Farm's initial statements that she had full replacement cost amount to fraud is an issue for the trier of fact.

As we have already stated, regardless of what State Farm told Everett in 1991, the fact remains that in 1997 the type of insurance that was purchased was eliminated. Thus, while Everett was within her right to rely on her agent's representation of full replacement coverage in the years preceding 1997, such was not the case after she was notified of a change in her coverage. Upon receipt of such notice, there is no evidence in the record that anyone from State Farm represented to Everett that she had full replacement coverage. Instead, from 1997 to the date of her loss, the record is devoid of any evidence of any contact between Everett and State Farm (or its agent) other than notice of the annual renewal and cost of Everett's insurance policy, and the receipt of Everett's annual premium payments. In short, there was no misrepresentation, negligent or intentional, and thus, summary judgment was proper as to these causes of action.

### IV. MOTION FOR JUDGMENT ON THE PLEADINGS

In her final claim, Everett contends she is entitled to reformation of her insurance contract because State Farm allegedly represented that she would have sufficient limits to replace her property. However, her contract does not reflect this representation.

According to Civil Code section 3399, a contract may be reformed when, due to "mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties." Contrary to Everett's claim, here there was no mistake or misrepresentation. The fact that Everett did not understand the 1997 notice informing her that her guaranteed replacement cost coverage was being eliminated is her fault. State Farm did not misrepresent anything regarding Everett's insurance policy. Thus, Everett is unable to show how the defect in her pleadings can be cured by amendment. As such, we find no abuse of discretion in the trial court's decision to grant State Farm's motion for judgment on the pleadings as to Everett's claim for reformation.

## V. DISPOSITION

The judgment is affirmed. State Farm is to recover its costs on appeal.

King, J., and Miller, J., concurred.

On May 16, 2008, the opinion was modified to read as printed above.

## APPENDIX A

FP-7855CA
S (6/95)

# IMPORTANT NOTICE...

## about changes to your policy

Enclosed with this message is your new State Farm Homeowners Policy which replaces your current policy. In an effort to provide protection for policyholders at an affordable price, we periodically make changes to your policy. Some of these changes broaden or add coverage. Some reduce or eliminate coverage. Others, although not intended to change coverage, could potentially reduce or eliminate coverage depending on court interpretations, and should, in that sense, be viewed as either actual or potential reductions in or eliminations of coverage. One very important change in your policy is the elimination of Guaranteed Replacement Cost and Guaranteed Extra Coverage.

We want to point out that every policy contains limitations and exclusions. We encourage you to read your entire policy, and note the following changes:

### I. REDUCTIONS OR ELIMINATIONS OF COVERAGE

**GUARANTEED EXTRA COVERAGE** *(Current Homeowners Extra Form 5)* and
**GUARANTEED REPLACEMENT COST COVERAGE** *(Current Endorsement to Homeowners Special Form 3)*

* These coverages are eliminated. Your policy now has a stated limit of liability under Coverage A that reflects the maximum that will be paid in case of loss. If Option ID - Increased Dwelling Limit is shown in the Declarations of your new policy, it may provide an additional limit for damaged building structures. However, the most State Farm will pay for loss to property under Coverage A is the stated limit of liability, plus any additional limit provided by Option ID, if shown in the Declarations. The policy no longer provides a guarantee to replace your home regardless of the cost.

**SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**

* Negotiable instruments, including checks, cashier's checks, traveler's checks, and money orders, are subject to a $1,000 limit.

* A $2,500 limit now applies to trading cards and comic books, including those in a collection.

**SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY, Property Not Covered**

* Cellular phones, CB radios, radar and laser detectors, and other similar equipment, and devices or instruments for the recording or reproduction of sound permanently attached to a vehicle are not covered.

FP-7855CA
S (6/95)

(CONTINUED INSIDE)

Printed in U.S.A.

Appendix A

**SECTION I - ADDITIONAL COVERAGES**

- Under Debris Removal, coverage for tree debris removal is now limited to $500.

- Land coverage is eliminated.

- One or more volcanic eruptions that occur within a 360-hour period will be considered one volcanic eruption.

- Collapse is revised to provide coverage only for direct physical loss to covered property involving the sudden, entire collapse of a building or part of a building.

 - A definition of collapse is added. Collapse means fallen down or fallen into pieces. Sagging and bowing are added to the events that are not included under the definition of collapse.
 - The collapse must be caused by one of the perils described under item 11. Collapse.
 - Language is added stating that hidden decay must be to a supporting or weight bearing structural member of the building. Hidden insect or vermin damage must be to a structural member of the building.

- The $2,000 Temporary Living Expense Allowance coverage is eliminated.

**SECTION I - LOSSES INSURED, COVERAGE B - PERSONAL PROPERTY**

- Vehicles, item 6., is revised to state that loss by a vehicle means impact by a vehicle.

**SECTION I - LOSSES NOT INSURED**

- Hot tubs and spas are no longer covered for loss consisting of or caused by freezing, thawing, pressure or weight of water or ice. Language is added to exclude the filtration and circulation systems of hot tubs, spas and swimming pools for these perils.

- Losses consisting of or caused by continuous or repeated seepage or leakage of water or steam over a period of time are now excluded, without regard to whether there is any resulting deterioration, corrosion, rust, mold, or wet or dry rot.

- Losses consisting of or caused by fungus are not covered.

- Losses consisting of or caused by pressure from or presence of tree, shrub or plant roots are not covered.

- Language has been added to state that losses caused by or consisting of weather conditions are not covered unless the resulting loss itself is covered.

- The definition of Water Damage is revised to eliminate loss caused by all water below the surface of the ground.

**SECTION I - LOSS SETTLEMENT, COVERAGE A - DWELLING, A1 - Replacement Cost Loss Settlement - Similar Construction (if shown in the Declarations)**

- The basis for repair or replacement of damage to property will be similar construction rather than equivalent construction.

- Wood fences are no longer covered for replacement cost. Payment is limited to the actual cash value of the damage to the fence at the time of the loss. *(Applies only to current Homeowners Extra Form 5.)*

- You are now required to complete the actual repair or replacement within two years after the date of loss and notify us within 30 days after the work has been completed in order to receive any additional payments on a replacement cost basis.

(CONTINUED ON INSIDE BACK COVER)

25

**SECTION I - LOSS SETTLEMENT, COVERAGE A - DWELLING, A2 - Replacement Cost Loss Settlement - Common Construction (if shown in the Declarations)**

* Wood fences are no longer covered for replacement cost. Payment is limited to the actual cash value of the damage to the fence at the time of the loss. *(Applies only to current Homeowners Extra Form 5.)*

* You are now required to complete the actual repair or replacement within two years after the date of loss and notify us within 30 days after the work has been completed in order to receive any additional payments on a replacement cost basis.

**SECTION I - LOSS SETTLEMENT, COVERAGE B - PERSONAL PROPERTY, B1 - Limited Replacement Cost Loss Settlement (if shown in the Declarations)**

* Language is revised to indicate that we will not pay more than our cost to replace an item.

**SECTION I - CONDITIONS**

* Our Option is revised to state that we may, at our option, repair or replace the damaged or stolen property with similar property, rather than equivalent property.

**OPTIONAL POLICY PROVISIONS (if shown in the Declarations)**

* Under Option BU - Business Pursuits, computer programming is added to the professional services for which there is no bodily injury or property damage coverage.

* Under Option OL - Building Ordinance or Law, there is no longer any Building Ordinance or Law coverage for any structure not attached to the dwelling.

## II. POTENTIAL REDUCTIONS OR ELIMINATIONS OF COVERAGE

Occasionally courts interpret your policy differently than we intended or anticipated. In order to preserve what we intended the former language to provide and to keep the policy affordable, we have made the changes indicated below. Accordingly, you should view these changes as either actual or potential reductions in or eliminations of coverage.

**SECTION I - COVERAGES, COVERAGE A - DWELLING, Property Not Covered**

* Language is added to emphasize that we do not cover the costs of repair techniques designed to compensate for or prevent land instability to any property, whether or not insured under Coverage A.

**SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**

* Language is revised to emphasize that the $200 aggregate limit also applies to all collections of money, coins and medals.

* Language is revised to emphasize that the $2,500 aggregate limit also applies to all stamp collections.

* Language is added to emphasize that all electronic data processing equipment that is part of a system is included in the $5,000 limit.

**SECTION I - COVERAGES, COVERAGE C - LOSS OF USE**

* Additional Living Expense language has been reworded to emphasize that expenses must be incurred by the insured for coverage to apply.

**SECTION I - LOSSES INSURED, COVERAGE B - PERSONAL PROPERTY**

* Language is added to emphasize that under the peril of sudden and accidental discharge or overflow, coverage is not provided for the back-up of sewage from outside the residence premises plumbing system.

(CONTINUED ON REVERSE)

**SECTION I - LOSSES NOT INSURED**

- Language is added to emphasize that mudslide and any earth movement resulting from improper compaction, site selection or any other external forces are included in the definition of Earth Movement and therefore are excluded from coverage.

- The definition of Water Damage is revised to emphasize that loss caused by or consisting of the following are not covered:
 - tsunami and seiche;
 - water or sewage from outside the residence premises plumbing system that enters through sewers or drains.

 **SECTION I - LOSS SETTLEMENT, COVERAGE B - PERSONAL PROPERTY, B2 - Depreciated Loss Settlement (if shown in the Declarations)**

- The basis for repair or replacement of damaged property will be the cost to repair or replace less depreciation.

 **OPTIONAL POLICY PROVISIONS (if shown in the Declarations)**

- Under Option IO - Incidental Business, language is added to emphasize that there is no coverage for electronic data processing system equipment.

## II. BROADENINGS OR ADDITIONS OF COVERAGE

**SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**

- The limit on stamps is increased from $1,000 to $2,500. *(However, see Potential Reductions or Eliminations regarding collection of stamps.)*

 **SECTION I - LOSS SETTLEMENT, B1 - Limited Replacement Cost Loss Settlement (if shown in the Declarations)**

- You now have up to two years, instead of one year, from the date of the loss to repair or replace personal property in order to obtain replacement cost benefits.

 **OPTIONAL POLICY PROVISIONS (if shown in the Declarations)**

- Option IO - Incidental Business is revised to include coverage for those detached structures which contain the business for which we are providing coverage.

The preceding items make up the changes in your Homeowners Policy. Please read your entire new policy carefully, and place it with your other important papers. If you have any questions about your new policy, contact your State Farm agent.

Policyholder Information Service

THIS MESSAGE DOES NOT CHANGE, MODIFY OR INVALIDATE ANY OF THE PROVISIONS, TERMS OR CONDITIONS OF YOUR POLICY AND APPLICABLE ENDORSEMENTS.

THIS MESSAGE IS A GENERAL DESCRIPTION OF COVERAGE AND/OR COVERAGE CHANGES AND IS NOT A STATEMENT OF CONTRACT.