Filed 8/31/21; Certified for Partial Publication 9/23/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| MATTHEW VULK, | C090073 |
| Plaintiff and Appellant, | (Super. Ct. No. SC-CV-CV-15-1146-21) |
| v. | |
| STATE FARM GENERAL INSURANCE COMPANY, | |
| Defendant and Respondent. | |
| GARY ANDRIGHETTO, | C090074 |
| Plaintiff and Appellant, | (Super. Ct. No. SC-CV-CV-15-1146-1) |
| v. | |
| STATE FARM GENERAL INSURANCE COMPANY, | |
| Defendant and Respondent. | |

1

| | |
|---|---|
| JAMES DALIN,<br><br>              Plaintiff and Appellant,<br><br>     v.<br><br>STATE FARM GENERAL INSURANCE COMPANY,<br><br>              Defendant and Respondent.<br>_____ | C090278<br><br>(Super. Ct. No. SC-CV-CV-15-1146-4) |

These consolidated appeals arise from an insurance coverage dispute following a wildfire that burned in Siskiyou County. In September 2014, the Boles Fire damaged and destroyed numerous homes in the town of Weed, including the homes owned by plaintiffs Gary Andrighetto, James Dalin, and Matthew Vulk. Plaintiffs and others filed suit against their insurance company, defendant State Farm General Insurance Company (State Farm), alleging various claims, including breach of contract and negligence. At the center of the parties' dispute is whether State Farm intentionally or negligently underinsured plaintiffs' homes. Plaintiffs argued their homes were insufficiently insured due to State Farm's alleged failure to calculate reasonable or adequate policy limits on their behalf for the full replacement cost of their homes.

After the trial court granted State Farm's motion for summary judgment against Andrighetto, Dalin and Vulk stipulated to entry of judgment in favor of State Farm. Each plaintiff timely appealed, and we consolidated the appeals for argument and disposition. Thereafter, we requested that the parties discuss in their briefing whether the judgments in the Dalin and Vulk matters need to be reversed pursuant to *Magaña Cathcart McCarthy v. CB Richard Ellis, Inc*. (2009) 174 Cal.App.4th 106 (*McCarthy*).[1]

---

[1] Plaintiffs are represented on appeal by the same attorney who represented them in the trial court. On appeal, counsel states, "This Court is not being asked to decide any

As we shall explain, we will affirm the judgment in the Andrighetto matter and reverse the stipulated judgments in the Dalin and Vulk matters; we remand the Dalin and Vulk matters for further proceedings.

## BACKGROUND

In view of the procedural posture of these consolidated appeals, we need only summarize the pertinent facts and procedural history related to the Andrighetto matter. In the Discussion section of our opinion, we provide additional background information relevant to the stipulated judgments entered in the Dalin and Vulk matters.

*The Property and Insurance Policy*

Andrighetto is the owner of the real property located at 444 Shasta Avenue, Weed, California (the property). State Farm began insuring the property in the early 1960's when it was owned by Andrighetto's parents. In 1970, Andrighetto insured the property after his father died. The property included a three bedroom, two bathroom house with a two-car attached garage, together approximately 1,500 square feet, and two storage structures.

In November 1993, Andrighetto submitted an application for homeowners insurance to State Farm. Thereafter, State Farm issued homeowners policy No. 55-VA-2434-8, effective November 30, 1993. The policy insured Andrighetto's dwelling, dwelling extensions, and personal property against various risks (including fire) up to stated policy limits. The coverage limit on his dwelling was initially set at $94,400.

Once a year from 1993 to 2013, State Farm sent Andrighetto an insurance renewal certificate setting forth his policy limits for the next policy term, which automatically increased each year to account for inflation. The renewal certificate sent to Andrighetto in 2013, which covered the period from November 30, 2013, to November 30, 2014,

---

additional issues arising from the Vulk or Dalin cases. Mr. Vulk and Mr. Dalin are effectively joining Mr. Andrighetto in asking the Court to review Mr. Andrighetto's proper summary judgment proceeding."

advised him that the policy limit for his home was "based on an estimate of the cost to rebuild [his] home, including an approximate cost for labor and materials in [his] area, and specific information that [he had] provided about [his] home." The renewal certificate informed Andrighetto that higher policy limits were available at higher premiums, that it was Andrighetto's responsibility to "choose the coverages and limits that [met his] needs," and that State Farm recommended that he purchase a coverage limit "at least equal to the estimated replacement cost of [his] home." The renewal certificate further advised Andrighetto that home replacement cost estimates could be obtained from various sources, including a building contractor or his insurance agent via a third-party vendor, and that State Farm "does not guarantee that any estimate will be the actual future cost to rebuild [his] home." The renewal certificate encouraged Andrighetto to "periodically review [his] coverages and limits with [his] agent and to notify [State Farm] of any changes or additions to [his] home."

When Andrighetto renewed his policy in 2013, the coverage limit on his dwelling was $184,900 (Coverage A), plus $18,490 for dwelling extension coverage (Coverage A).[2] The dwelling-related coverage limits also included the following optional coverages: (1) Option ID, which provided an additional sum, equal to 20 percent of the policy maximum, for increased dwelling and dwelling extension costs; (2) Option OL, which provided an additional sum, equal to 10 percent of the policy maximum, for statutory or building code-compliance costs; and (3) an additional sum, equal to 5 percent of the policy maximum, for dwelling debris removal costs.

---

[2] On the date of the Boles Fire, September 15, 2014, the dwelling-related coverage limits were slightly higher, as State Farm prorates inflation increases during the policy year up to the date of loss. The coverage limit on Andrighetto's dwelling was $188,598, plus $18,859.80 for dwelling extension coverage; the optional coverages were also slightly higher due to the inflation increases.

4

In addition to the annual renewal certificate, every two years, including in October 2012, State Farm sent Andrighetto the California Residential Property Insurance disclosure form mandated by Insurance Code section 10102. This form listed and defined various types of insurance coverage, including: (1) "replacement cost coverage," which "only pays for replacement costs up to the limits specified in [the] policy"; (2) "extended replacement cost coverage," which "provides additional coverage above the dwelling limits up to a stated percentage or specific dollar amount"; and (3) "guaranteed replacement cost coverage," which "covers the full cost to repair or replace the damaged or destroyed dwelling . . . regardless of the dwelling limits shown on the policy declarations page." (See Ins. Code, § 10102, subd. (a).)

The disclosure form sent to Andrighetto in October 2012 advised him that he had purchased extended replacement cost coverage for his dwelling and building code upgrade coverage, and that guaranteed replacement cost coverage, which he did not purchase, was the broadest level of coverage.[3] The form additionally advised Andrighetto that his policy's declarations page identified the specific coverage limits he purchased, and explained that it was important for him to consider whether the limits were sufficient to meet his needs and that he should contact his insurance agent or insurance company if he had any questions about the coverage he purchased or if he wanted to discuss his coverage options. The form specifically warned Andrighetto about being "underinsured" (i.e., insuring his home for less than its replacement cost), which "may result in [his] having to pay thousands of dollars out of [his] own pocket to rebuild [his] home if it is completely destroyed." The form advised Andrighetto that the coverage limit on his dwelling should be high enough to allow him to rebuild his home in

---

[3] "In 1997, State Farm eliminated the guaranteed replacement cost coverage in its homeowner policies." (*Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 652 (*Everett*).)

the event it is completely destroyed, and encouraged him to obtain a current estimate of the cost to rebuild his home from his insurance agent or insurance company, or to obtain an independent appraisal from a local contractor, architect, or real estate appraiser, and to contact his agent or insurance company immediately if he believed his coverage limits might be inadequate. The form explained that a current estimate of the cost to replace his home could "help protect [him] against being underinsured," and that if he obtained such an estimate and wanted to change his coverage limits, he should contact his insurance company. Thus, State Farm notified Andrighetto that he did not have guaranteed replacement cost coverage for his home; rather, he was insured for replacement only to the extent of the coverage limits set forth on his policy's declarations page.

Every five years, including in August 2009 and August 2014, State Farm sent Andrighetto a letter providing him "information about an important aspect of . . . homeowners coverage – estimating the cost to replace [his] home at today's reconstruction prices." The letter identified several ways to obtain such an estimate, including using a recent replacement cost appraisal, a recent building contractor's estimate, or working with his insurance agent using Xactware software. State Farm specifically advised Andrighetto that it does not guarantee that any replacement cost estimate will be the actual future cost to rebuild his home and recommended that Andrighetto purchase insurance coverage in an amount at least equal to the estimated cost to replace his home. In doing so, State Farm informed Andrighetto that while he estimated the cost to replace his home when he originally purchased his homeowners policy (i.e., in 1993), it recommended that he review his policy each year to ensure he had sufficient insurance coverage. State Farm emphasized that such a review was particularly important if Andrighetto felt that home improvements, rising construction costs, or other economic factors made his original estimate outdated.

6

*Andrighetto's Deposition*

Andrighetto was deposed in June 2017. During his deposition, Andrighetto stated that he could not recall receiving any document from State Farm summarizing the coverage limits of his homeowners policy, but acknowledged that even if he had received any such documents, he "probably wouldn't have looked at [them] anyhow," as he usually threw away anything that was not a billing invoice. Andrighetto explained that he never read his policy and was unaware of its coverage limits, except for the dwelling "base amount" of $188,000. Andrighetto added that, prior to the Boles Fire, he never had any concerns or questions about his policy, never asked his insurance agent about coverage or coverage limits, and did not inform State Farm about any improvements to the property.

Andrighetto stated that he told his insurance agent, Laura Winkelman, that he wanted the "best policy" for his home. When asked, he said that this conversation most likely occurred when Winkelman took over his account; although Andrighetto did not recall when that happened, it is undisputed that Winkelman became Andrighetto's insurance agent in 2007. He indicated that Winkelman had been with State Farm a long time, and that his conversation with her occurred a long time ago, maybe 15 to 20 years ago. He claimed that he told Winkelman he wanted the "best policy" for his house because it was his biggest investment. In response, she told him the coverage limits of his policy and said that it provided "full coverage."

Andrighetto explained that he trusted his insurance agents to procure "the right amount" of insurance and assumed his agents knew what they were doing and would "give [him] the right policy for [his] house." He assumed that Winkelman would automatically increase his coverage limits as necessary to ensure the sufficiency of his coverage and would continue to do so over time. However, he acknowledged that he never confirmed that Winkelman was making such increases and she never told him that he "would have enough insurance no matter what." When asked, Andrighetto said that

7

he saw his policy's declarations page for the first time on the day after the Boles Fire. He explained that he met with Winkelman and she told him the coverage limits of his policy and that his policy would cover his "loss for everything." When Andrighetto was specifically asked whether he gave as much detail about every conversation he had with Winkelman, he said: "The only conversation I had with her was basically right after the fire."

*The Boles Fire, Andrighetto's Insurance Claim, and Reconstruction*

On September 15, 2014, the Boles Fire completely destroyed Andrighetto's home. He reported the loss to Winkelman the following day and she assured him that he had a "full coverage policy," which would cover his "loss for everything," including "the house and all the contents and stuff."

State Farm investigated Andrighetto's insurance claim and paid him the coverage limits for the dwelling-related damage in the aggregate amount of $285,725.37. State Farm also paid Andrighetto the coverage limit for personal property loss, $143,949.00, and additional living expense reimbursements in the amount of $37,221.30. In total, Andrighetto received $466,896.27 from State Farm to pay for his losses caused by the Boles Fire.

In June 2015, Andrighetto entered into a contract with AWM Construction, Inc. (AWM) to rebuild his home and install certain hardscaping. Construction was completed in December 2015. According to Andrighetto, his new home is a near duplicate of his old home, with slight layout and finishing differences. Andrighetto paid AWM $236,173.26 for its work. In total, Andrighetto estimated that he spent approximately $260,000 to $270,000 to replace his home and other structures on the property.

A contractor hired by Andrighetto's public adjuster estimated that the actual cost to replace Andrighetto's home would have been $365,450.26. As such, Andrighetto claims that his insurance policy did not provide full coverage, since he was "forced to build a substantially cheaper replacement house."

8

*The Lawsuit*

In September 2015, Andrighetto and others filed suit against State Farm.[4]  A second amended complaint was filed in February 2017; it asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and unfair trade practices in violation of the Unfair Competition Law (UCL).  As relevant here, the breach of contract claim is predicated on State Farm's conduct in intentionally or negligently underinsuring Andrighetto's home by failing to provide "the amount of insurance coverage necessary to protect [him] in the event of a loss."  The breach of the implied covenant of good faith and fair dealing claim is based on State Farm's conduct in handling his insurance claim, including misrepresenting pertinent facts related to coverage and intentionally underinsuring his home.  The negligence claim alleged that State Farm breached its duty to use reasonable care in estimating the replacement cost of his home for the purpose of setting coverage limits, thereby resulting in unreasonably low coverage limits.  The claim further alleged that State Farm negligently misrepresented the actual replacement cost of his home by providing him with replacement cost estimates that were "unreasonably low."  Andrighetto asserted that he reasonably relied on the replacement cost estimates provided by State Farm and reasonably believed that his home was insured for the full replacement cost.  Finally, the UCL claim is predicated on State Farm's allegedly unlawful, unfair, or fraudulent business practice of underinsuring their customers' homes by underestimating the replacement cost of the homes, while failing to

---

[4]  The original complaint and first amended complaint named three State Farm insurance agents as defendants, including Winkelman.  Pursuant to a stipulation, these individual defendants were dismissed from the action in October 2016.  As part of the stipulation, the parties agreed that the named insurance agents "were acting within the course and scope of their agency relationship with State Farm, with respect to the facts alleged in the [operative pleading]."

disclose all relevant information and misleading customers to believe their homes were insured up to the full replacement cost.

*Motion for Summary Judgment/Adjudication*

In October 2018, State Farm filed a motion for summary judgment or in the alternative summary adjudication of issues against Andrighetto. In support of its motion, State Farm argued that the breach of contract and breach of the implied covenant of good faith and fair dealing claims failed as a matter of law because State Farm paid Andrighetto all benefits due under his policy and did not act unreasonably with respect to the handling of his insurance claim. State Farm additionally argued that Andrighetto's negligence claim failed as a matter of law because State Farm did not breach any duty of care owed to him and/or he did not suffer any damages from any alleged breach. Finally, State Farm argued that Andrighetto's UCL claim failed as a matter of law because he could not demonstrate the existence of any unlawful, unfair, or fraudulent conduct and/or that he suffered damage from any such conduct.

Andrighetto opposed State Farm's motion. In connection with the summary judgment proceedings, the parties stipulated that Andrighetto was paid the coverage limits set forth in his homeowners policy "as written," and that his insurance claim "was adjusted in a reasonable manner and consistent with State Farm's obligations under the covenant of good faith and fair dealing."[5]

After a hearing, the trial court granted State Farm's motion for summary judgment. The court sustained various objections State Farm made to the evidence submitted by Andrighetto in opposition to the motion. Andrighetto has not challenged any of the trial court's evidentiary rulings and therefore has waived any evidentiary issue

---

[5] Andrighetto stated in deposition that he never saw anything in writing from State Farm denying coverage for any aspect of his insurance claim.

on appeal.  (See *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014-1015.)  Andrighetto timely appealed.

## DISCUSSION

### I

### *Motion for Summary Judgment*

A.  *Standard of Review*

On appeal from the grant of a motion for summary judgment, " ' " '[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' "  [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' "  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)  " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law.  [Citations.]  The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action."  (*Id.* at p. 720.)

Because the trial court's judgment is presumed to be correct, plaintiffs (as the appellants) have the burden of affirmatively establishing reversible error.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 535.)  For this reason, our review is limited to issues that have been adequately raised and supported in the appellant's brief.  (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379.)  Because "we review 'the ruling, not the rationale,' " on this appeal from summary judgment, we may affirm on any basis supported by the record and the law.  (*Skillin v. Rady Children's Hospital & Health Center* (2017) 18 Cal.App.5th 35, 43.)

B.  *Negligence Claim*

Andrighetto contends the trial court erred in granting summary judgment on his negligence claim.  He argues that a triable issue of material fact exists as to whether State Farm had a special duty of care to provide him insurance coverage that equaled the cost to replace his home.  We disagree.

1.  *Applicable Legal Principles*

To establish negligence, a plaintiff must prove that:  (1) the defendant had a legal duty of care towards the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered injury as a proximate result of the breach; and (4) damage to the plaintiff.  (*Wallman v. Suddock* (2011) 200 Cal.App.4th 1288, 1308 (*Wallman*).)  "Whether a duty of care exists is a question of law for the court."  (*Id*. at p. 1309.)

"[A]s a general proposition, an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage."  (*Fitzpatrick v. Hayes* (1997) 57 Cal.App.4th 916, 927 (*Fitzpatrick* ); see also *Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1403-1404.)  "[I]n the ordinary case, 'the onus is . . . squarely on the insured to inform the agent of the insurance he requires.' "  (*Wallman, supra,* 200 Cal.App.4th at p. 1309; see *Everett, supra,* 162 Cal.App.4th at p. 660 [an insurer does not have a general duty to set policy limits for insureds, including policy limits that equal the cost to replace an insured's home; rather, "[i]t is up to the insured to determine whether he or she has sufficient coverage for his or her needs"].)

The general no-duty rule changes *only* when one of the following three things occurs:  (1) the agent misrepresents the nature, extent or scope of the coverage being offered or provided;  (2) there is a request or inquiry by the insured for a particular type or extent of coverage; or (3) the agent assumes an additional duty by either express agreement or by holding themself out as having expertise in a given field of insurance being sought by the insured.  (*Roberts v. Assurance Co. of America, supra,* 163

12

Cal.App.4th at pp. 1403-1404.) To trigger a special duty of care under the first scenario, there must be an affirmative misrepresentation. (*Sheahan v. State Farm Gen. Ins. Co.* (2020) 442 F.Supp.3d 1178, 1187.) To trigger a special duty of care under the second scenario, an insured's request for a particular type or extent of coverage must be sufficiently "targeted" or "specific" before an insurance agent will be held to have undertaken an obligation to procure the coverage. (*Fitzpatrick, supra,* 57 Cal.App.4th at pp. 928-929.)

2. *Analysis*

As we shall explain, we conclude that Andrighetto was precluded from opposing summary judgment on the theory that State Farm owed him a special duty of care to procure additional insurance coverage; specifically, coverage that equaled the cost to replace his home. Even were we to overlook this deficiency, Andrighetto's negligence claim fails as a matter of law.

It is well-settled that the pleadings set the boundaries of the issues to be resolved at summary judgment. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1254 (*Conroy* ); *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648.) "Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' [Citation.] 'To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion. [Citations.]' [Citation.] '[T]he pleadings "delimit the scope of the issues" to be determined and "[t]he complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action." [Citation.] [Plaintiff's] separate statement of material facts is not a substitute for an amendment of the complaint.' " (*Laabs v. City of Victorville* (2008) 163

Cal.App.4th 1242, 1253; see *Jacobs v. Coldwell Banker Residential Brokerage Co*. (2017) 14 Cal.App.5th 438, 444 (*Jacobs*) [since the pleadings define the scope of summary judgment, " '[a] party may not oppose a summary judgment motion based on a claim, theory, or defense that is not alleged in the pleadings,' and '[e]vidence offered on an unpleaded claim, theory, or defense is irrelevant because it is outside the scope of the pleadings' "].)  Similarly, " ' "[d]eclarations in opposition to a motion for summary judgment 'are no substitute for amended pleadings.' " ' " (*Conroy, supra,* 45 Cal.4th at p. 1254.)

As relevant here, the operative complaint alleges that State Farm negligently underinsured Andrighetto's property by "not providing the amount of insurance coverage necessary to protect [him] in the event of a loss."  According to Andrighetto, State Farm negligently set the coverage limits of his policy unreasonably low, thereby underinsuring his property.  These allegations implicate the line of cases resolved under the general rule that insurers and their agents have no duty to ensure that a policy will cover the full amount of any insured loss.  (See, e.g., *Fitzpatrick, supra*, 57 Cal.App.4th at pp. 921-923 [discussing cases].)  The complaint does not allege a separate claim for negligent misrepresentation, which is a different tort with different elements than the tort of negligence.  (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 227-228.)

In his opposition to State Farm's motion for summary judgment, Andrighetto recharacterized his negligence claim.  He argued, as he maintains on appeal, that his negligence claim involved the "failure to deliver the agreed-upon coverage," and that Winkelman's description of his policy as providing "full coverage" constituted a misrepresentation that would mislead an ordinary consumer to believe his policy had sufficient limits to replace his home.  In recharacterizing his negligence claim, Andrighetto has implicated the line of cases involving a special duty of care, which concerns exceptions to the general no-duty rule.  (*Fitzpatrick, supra*, 57 Cal.App.4th at pp. 923-927 [discussing cases].)

Since the operative complaint, construed broadly, does not allege any facts related to a special duty of care theory of negligence liability, this theory cannot serve as a basis to reverse the trial court's grant of summary judgment. (*Conroy, supra,* 45 Cal.4th at p. 1254; see *Comunidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116, 1125 [" ' "[a] party cannot successfully resist summary judgment on a theory not pleaded" ' "].) If, after State Farm moved for summary judgment, Andrighetto believed he had evidence to support such a theory, it was incumbent upon him to seek to amend the complaint at or prior to the hearing on the motion for summary judgment. (*Laabs v. City of Victorville, supra,* 163 Cal.App.4th at pp. 1257-1258.) He failed to do so. Thus, he cannot obtain reversal of the trial court's summary judgment ruling on the basis that there was a triable issue of material fact as to whether State Farm had a special duty of care to provide him insurance coverage that equaled the cost to replace his home. As the *Laabs* court noted, "To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target." (*Id.* at p. 1258, fn. 7; see *Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338, 1353 [plaintiff whose complaint alleged negligence but not a theory of negligence per se and who did not seek to amend complaint to include such allegations cannot defeat summary judgment by raising a theory of negligence per se].)

Further, contrary to Andrighetto's contention, the evidence before the trial court, liberally construed in his favor, does not show the existence of a triable issue of material fact on the special duty of care theory. As we have set forth in detail *ante*, Andrighetto did not direct the trial court to any evidence showing that he specifically requested Winkelman procure full replacement cost coverage for his home prior to the Boles Fire. Nor did he cite any evidence showing that he ever asked her whether his insurance coverage was adequate to replace his home in the event of a total loss. Indeed, Andrighetto stated in his deposition that he never made a specific inquiry as to the type or extent of coverage provided by his homeowners policy. He explained that, prior to the

15

Boles Fire, he never read his policy, never had any concerns or questions about it, never contacted or met with his insurance agent to discuss coverage limits, and never requested a specific type of coverage or that his coverage limits be changed  Further, he did not claim that he ever asked Winkelman or arranged for a current estimate of the cost to rebuild his home under current construction prices (even though this was also one of the recommendations in the bi-annual disclosure form designed to protect against insureds being underinsured).

In his declaration filed in support of his opposition to State Farm's motion for summary judgment, Andrighetto stated:  "When Laura Winkelman took over my account, I asked her to make sure I had the best policy, and she told me I had full coverage on my house."  He added that he "trusted and relied on my State Farm agent, and I thought that full coverage meant that I would have enough coverage to rebuild my home."

At the hearing on State Farm's motion, Andrighetto pointed out for the first time that there was a portion of his deposition testimony in which he stated that he had a conversation with Winkelman "a long time ago," "[m]aybe when she got there" (i.e., began working for State Farm), wherein he told her that he wanted "the best policy."  In response, Winkelman told him the coverage limits of his policy and said that it was a "full coverage" policy.  He argued that this evidence, in addition to his declaration, precluded summary judgment in favor of State Farm on his negligence claim.  The trial court disagreed, stating that Andrighetto had failed to articulate a reason why he did not clearly state in his deposition, which occurred a year-and-a-half before the execution of his declaration, that his conversation with Winkelman about full coverage occurred prior to the Boles Fire.  In granting State Farm's motion, the court found that Andrighetto had failed to present evidence showing that Winkelman told him he had a full coverage policy prior to the Boles Fire, or that she made such a comment in response to his request for the best policy at any time.

16

On this record, we see no error in the trial court's decision to grant summary judgment in favor of State Farm. As an initial matter, we cannot fault the trial court for treating Andrighetto's self-serving, conclusory declaration with skepticism, absent a credible explanation for why he did not clearly state during his deposition that Winkelman told him prior to the Boles Fire that he had "full coverage" for his home in response to his request for the "best policy." (See *Whitmire v. Ingersoll-Rand Co*. (2010) 184 Cal.App.4th 1078, 1087 [trial court may disregard declaration submitted in opposition to a motion for summary judgment motion that clearly contradicts the declarant's earlier deposition testimony].) Andrighetto's statements in his deposition did not clearly indicate that the alleged conversation occurred prior to the Boles Fire. When asked, he stated that he did not know when the conversation occurred. He said that the conversation "probably" occurred when Winkelman "first took over," and that it occurred "a long time ago"; "Maybe when she got there. I don't remember." However, when he was later specifically asked whether he gave as much detail about every conversation he had with Winkelman, he said, "The only conversation I had with her was basically right after the fire."

As we have explained, State Farm was not required to refute liability on a theory of liability raised by Andrighetto for the first time in his opposition to the motion for summary judgment, and the trial court did not need to address the theory in ruling on the motion. But even if we were to consider the merits of the newly raised theory and liberally construe the record as containing evidence that Winkelman told Andrighetto that he had "full coverage" for his home prior to the Boles Fire in response to his request for the "best policy," we would conclude that the evidence was insufficient to establish a triable issue of fact as to whether Winkelman assumed a special duty of care to ensure Andrighetto had full replacement cost coverage for his home under a misrepresentation of coverage theory or a failure to procure the agreed-upon coverage theory.

17

The summary judgment record reflects that Andrighetto never specifically requested that Winkelman procure full replacement cost coverage or 100 percent replacement cost coverage for his home. Rather, Andrighetto made a vague and conclusory request for the "best policy" and never specifically asked Winkelman whether the coverage limits of his policy were adequate to rebuild his home in the event of a total loss. Further, Andrighetto neither asked Winkelman nor arranged for a third party to provide a current estimate to rebuild his home at current construction prices, and Winkelman never specifically told Andrighetto that he had full replacement cost coverage or 100 percent replacement cost coverage for his home. Nor did Winkelman ever tell Andrighetto that the coverage limits of his policy were adequate to rebuild his home in the event of a total loss. A non-specific request for the "best policy" and a general assurance of "full coverage" is not the same as a specific request for and assurance of 100 percent replacement cost coverage. (See *Fitzpatrick, supra*, 57 Cal.App.4th at pp. 921-930 [finding no special duty to procure additional insurance where agent did business with insureds for 20 years, knew "generally" that the insureds wanted "the upper limits of coverage" and told the insureds "several times" that coverage was "adequate"; agent gave no specific advice as to adequacy of coverage and insureds made no specific inquiry about the coverage they wanted]; see also *Wallman, supra*, 200 Cal.App.4th at pp. 1310-311 [finding no special duty to procure additional insurance where insureds' statements to their insurance agent about the kind of coverage they wanted were "extremely general in nature," including a vague request for insurance that would protect them in the event of " 'any possible lawsuit that could happen in the future' "]; *Ahern v. Dillenback* (1991) 1 Cal.App.4th 36, 40 [finding no special duty to procure additional insurance where insured asked for "full coverage or the 'best coverage that exists' " and "the best policy there is," and was assured of "full insurance coverage"; insureds did not specifically request the particular coverage they claimed should have been procured and insurance agent did not represent they had such coverage ]; cf.

18

*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1114 [order sustaining demurrer reversed where insured alleged he had specifically requested "100 percent coverage for the cost of repairing or replacing improvements to the property, including any increase for inflation" and the insurance agent had "personally inspected the property to determine the amount of coverage needed" and then "orally represented that the policy provided '100 coverage for costs of repairs and/or replacement of the improvements to the property including any and all increases in costs of repair or rebuilding in the event of a loss' "]; *Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726, 1728-1731 [order sustaining demurrer reversed where insured repeatedly asked and was repeatedly assured by his insurer that the coverage limits of his policy were adequate to rebuild his home].)[6]

C. *UCL Claim*

Andrighetto contends the trial court erred in granting summary judgment on his UCL claim. We disagree.

1. *Additional Background*

In support of his UCL claim, Andrighetto alleged that State Farm "repeatedly and systematically underinsured their customers . . . as part of an unlawful, unfair or fraudulent business act or practice designed to sell insurance policies at a lower premium, thus making [State Farm] more competitive in the marketplace." According to Andrighetto, State Farm's "unlawful, unfair or fraudulent business acts or practices were carried out by the use of software and a system of agent and employee training that caused [State Farm] and [its agents/brokers] to underestimate the replacement costs of

---

[6] We reject Andrighetto's attempt to establish a triable issue of fact on the duty of care issue by relying on opinions from an expert. The existence and the scope of a duty of care in a given factual situation are issues of law for the court. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674, disapproved on another ground as stated in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.)

19

insured [property] consistently, while failing to disclose all relevant information to [their] . . . customers."

In its motion for summary judgment, State Farm argued, among other things, that Andrighetto's UCL claim failed as a matter of law because he could not demonstrate the existence of any unlawful, unfair, or fraudulent conduct. In response, Andrighetto stated that his UCL claim sought "to prevent State Farm from engaging in the unlawful, unfair, and fraudulent practice of selling supposedly 'replacement cost' insurance with unreasonably low policy limits," that is, "policies that only provide a fraction of the coverage needed to replace a house, while calling [the policies] a replacement cost policy." Andrighetto asserted that the unfair and fraudulent conduct at issue in this case is the "unreasonably low replacement cost number" (i.e., estimate) State Farm provides its insureds in the annual renewal certificates, which are misleading to the extent they are an incomplete estimate as to the actual cost to rebuild a home and cannot meaningfully be compared with a competitor's estimate that takes into account each component necessary to rebuild a home. Andrighetto further indicated that State Farm's conduct violated Insurance Code section 790.3 because such estimates mislead consumers.

The trial court ruled that summary judgment on this claim was warranted because Andrighetto failed to raise a triable issue of material fact as to whether State Farm engaged in conduct that was unlawful, unfair, or fraudulent.

### 2. *Analysis*

"Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) On appeal, Andrighetto reiterates that his UCL claim seeks to protect the public by enjoining State Farm from selling homeowners insurance policies that "only provide a fraction of the coverage needed to replace a house while calling it a replacement cost policy." As he did in the trial court, Andrighetto points to a regulation adopted by the California Insurance Commissioner (Cal. Code Regs., tit. 10, § 2695.183 [titled "Standards for Estimates of Replacement Value"])

(hereafter "replacement cost regulation") to show that State Farm engages in an unlawful, unfair, and fraudulent business practice of misleading insurers by providing replacement cost estimates for homes that were unreasonably low and failed to accurately reflect the actual cost to rebuild the homes in violation of the regulation and Insurance Code section 790.3.

The Unfair Insurance Practices Act (UIPA) (Ins. Code, § 790 et seq.) authorizes the Insurance Commissioner to investigate those engaged in the insurance business to determine "whether insurance companies are or have been engaged 'in any . . . deceptive act or practice prohibited by Section 790.03.' " (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 387 (*ACIC*).) "The Legislature directed the . . . Commissioner to "promulgate reasonable rules and regulations . . . as are necessary to administer" the UIPA. (*Id.* at p. 382.)

In December 2010, the Office of Administrative Law approved regulations (including the replacement cost regulation) proposed by the Commissioner, which became effective on June 27, 2011, to address concerns regarding the persistent problem of underinsurance in the context of rebuilding homes damaged or destroyed by wildfires. (*ACIC, supra,* 2 Cal.5th at pp. 382-384.) The purpose of promulgating the replacement cost regulation (Cal. Code Regs., tit. 10, § 2695.183) was to standardize "the components of a replacement cost estimate 'to create a more consistent, comprehensive and accurate replacement cost calculation' and clarified that estimates 'not comporting with the applicable provision of the regulation will constitute making a statement with respect to the business of insurance which is misleading and which by the exercise of reasonable care should be known to be misleading' " within the meaning of Insurance Code section 790.03. (*ACIC*, at pp. 383-384.) The replacement cost regulation "does not require an insurer to set or recommend a policy limit or to provide an estimate of the cost to rebuild or replace a home. [Citation]. But if the insurer does choose to opine on replacement costs, the [r]egulation specifies how that estimate is to be calculated and communicated.

21

In particular, it bars the insurer from communicating a replacement cost estimate in connection with an application for or renewal of a homeowners' insurance policy 'unless the requirements and standards set forth in [the regulation] are met.' " (*Id.* at pp. 384, 385, fn. 1 [setting forth requirements and standards].)

We conclude Andrighetto's UCL claim fails as a matter of law to the extent it is predicated on acts prohibited by the UIPA. Our Supreme Court has held that "[p]rivate UIPA actions are absolutely barred; a litigant may not rely on the proscriptions of section 790.03 as the basis for a UCL claim." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 384 [insurers may be liable under the UCL for conduct that violates other laws in addition to the UIPA, but violations of the UIPA alone may not form the basis of a UCL claim].) *Zhang* makes clear that "a plaintiff may not use the UCL to 'plead around' an *absolute* bar to relief." (*Zhang*, at p. 369.) Andrighetto has failed to show that there is a triable issue of material fact as to whether State Farm violated any other law in addition to the UIPA or otherwise engaged in unfair or fraudulent conduct within the meaning of the UCL. As a consequence, he has failed to show that the trial court improperly granted summary judgment on his UCL claim.[7]

D. *Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims*

As noted *ante*, the parties entered into a stipulation in connection with the summary judgment proceedings. As relevant here, the parties stipulated that "there are no unpaid coverage amounts due to . . . Andrighetto under [his homeowners] [p]olicy as written, and that [Andrighetto's insurance] [c]laim was adjusted in a reasonable manner and consistent with State Farm's obligations under the covenant of good faith and fair

---

[7] Given our conclusions, we need not and do not decide whether the estimate provided by State Farm in the annual renewal certificates constitutes a "replacement cost estimate" within the meaning of the UIPA, as Andrighetto contends.

dealing." The parties also stipulated that, in light of these stipulations, "the only allegations remaining as to Andrighetto's breach of contract and bad faith causes of action are that: State Farm had a duty under the contract to use a reasonably complete replacement cost estimate that complied with 10 Cal. Code of Reg. section 2695.183 [i.e., the replacement cost regulation] and other California law when renewing [his] [p]olicy."

On appeal, Andrighetto has not pointed to any express term of his homeowners policy that State Farm breached. Instead, as he did in the trial court, he insists that he has a viable implied contract claim based on the same facts supporting his negligence claim. He argues that State Farm and its agent, "having undertaken to provide a 'full coverage' homeowner policy, . . . owed [him] a contractual duty to perform reasonably and adequately." He adds that "when [he] requested the 'best policy' and State Farm's agent told [him] his replacement cost policy provided 'full coverage,' that created a duty to provide coverage that was within a reasonable margin of error of the actual replacement cost of [his] house. That duty can be enforced by a lawsuit either in contract or in tort." As for his claim for breach of the implied covenant of good faith and fair dealing, Andrighetto argues, as he did below, that State Farm failed to advise him that its agents do not provide a reasonably accurate estimate of the cost to replace his home.

We conclude Andrighetto's appellate arguments are barred by the parties' stipulation. Parties may, as here, agree by stipulation to limit the issues presented to the trial court and the court will respect such stipulation. (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 733.) The plain terms of the parties' stipulation make clear that Andrighetto's arguments are outside the scope of issues the parties agreed would be presented to the trial court. Therefore, he cannot obtain a reversal of the trial court's summary judgment ruling based on these contentions.

In any event, Andrighetto has not shown error. The operative complaint alleges breach of an express contract, *not* an implied contract. Therefore, Andrighetto cannot obtain reversal of the trial court's summary judgment ruling on such a theory. (*Jacobs*,

23

*supra*, 14 Cal.App.5th 438, 444; *Comunidad en Accion v. Los Angeles City Council*, *supra*, 219 Cal.App.4th at p. 1125.)  Moreover, Andrighetto has failed to show the existence of a valid implied contract for full replacement cost coverage[8] or that the trial court otherwise erred in granting summary judgment on his claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Indeed, as we have noted, the parties stipulated that Andrighetto was paid all benefits due under the terms of the insurance policy, and that his insurance claim was handled in a manner consistent with State Farm's obligations under the covenant of good faith and fair dealing.  (See *Everett, supra*, 162 Cal.App.4th at pp. 660, 663 [granting summary adjudication on breach of contract and breach of the implied covenant of good faith and fair dealing claims where insurer paid all benefits to which insured was entitled to receive]; *Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1468 [concluding that insured had no viable claim for breach of contract because insurer paid all policy benefits insured was entitled to]; *Mosley v. Pacific Specialty Ins. Company* (2020) 49 Cal.App.5th 417, 435 [" '[T]here are at least two separate requirements to establish breach of the implied covenant:  (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause' "].)[9]

---

[8]  Where a written contractual term exists, "the law does not recognize implied contract terms that are at variance with the terms of the contract as expressly agreed . . . ." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 412, italics omitted.)  " '[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.' " (*Grebow v. Mercury Ins. Co.* (2015) 241 Cal.App.4th 564, 580.)

[9]  In view of our conclusions, we need not and do not address any other issue raised by the parties related to the merits of the trial court's summary judgment ruling.

II

*Stipulated Judgments*

After the trial court granted State Farm's motion for summary judgment against Andrighetto, Dalin and Vulk decided not to oppose the separate pending motions for summary judgment filed by State Farm. Instead, in light of the overlapping legal issues and factual similarities between their claims and Andrighetto's claims, they stipulated to entry of judgment in favor of State Farm. In doing so, Dalin and Vulk conceded that the facts of their cases were "sufficiently similar" to the facts of Andrighetto's case such that they could not prevail on any of their claims based on the trial court's legal conclusions in granting summary judgment against Andrighetto. The stipulations executed by Dalin and Vulk explained that they stipulated to entry of judgment in favor of State Farm in the interest of judicial economy to facilitate and participate in an appeal of the issues decided in the Andrighetto case (not to settle their cases), that they intended for Andrighetto's case to serve as the lead case on appeal to test the trial court's summary judgment ruling, and that they intended the stipulated judgment to be subject to the same outcome as Andrighetto's case. Thus, if Andrighetto did not prevail on appeal, the judgments entered against them would become final to the same extent as the judgment against Andrighetto.

Dalin and Vulk timely appealed from the stipulated judgments, and we consolidated these appeals with Andrighetto's appeal for argument and disposition. We now conclude under *McCarthy, supra*, 174 Cal.App.4th 106, that the stipulated judgments must be reversed.

In *McCarthy*, the appellate court reversed a stipulated judgment based on an agreement that the trial court would have granted summary judgment in favor of defendant based on the trial court's ruling on certain "threshold" legal issues in favor of defendant. (*McCarthy*, *supra*, 174 Cal.App.4th at pp. 110, 116.) In doing so, the court recognized that parties may stipulate to a judgment in order to secure appellate review of a dispositive adverse legal ruling, but concluded that such a practice is prohibited where

25

the parties fail to comply with the mandatory requirements of a motion for summary judgment, including the filing of a motion and separate statements of undisputed facts. (*Id.* at pp. 110, 116-117)  The court reasoned that the failure to comply with the summary judgment procedural requirements results in an inadequate record for appellate review, including whether there are any triable issues of material fact.  (*Id*. at pp. 117-118.)

Dalin and Vulk argue that reversal of the stipulated judgments is not required under *McCarthy* because they are asking us to review "a proper summary judgment proceeding"; namely, the summary judgment motion granted against Andrighetto.  In support of their position, Dalin and Vulk state:  "This Court is not being asked to decide any additional issues arising from the Vulk or Dalin cases.  Mr. Vulk and Mr. Dalin are effectively joining Mr. Andrighetto in asking the Court to review Mr. Andrighetto's proper summary judgment proceeding."  State Farm, for its part, argues that reversal is not required under *McCarthy* because, unlike the parties in *McCarthy*, it complied with all the procedural requirements in moving for summary judgment.  In making this argument, State Farm invokes the line of cases which recognize that, although a party is generally precluded from appealing a consent or stipulated judgment, an exception exists where consent was merely given to facilitate an appeal of a dispositive ruling.  In each case, the stipulated judgment followed the filing of a motion for summary judgment. (See, e.g., *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 393-394, 400-403 [after defendant filed motions for summary judgment, the parties agreed the court could grant summary judgment based on statute of limitations defense to obtain appellate review where facts were undisputed]; *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 816 [stipulated judgment was not bared by the rule against appeal from consent judgments because "partial summary judgment" in favor of defendant was effectively dispositive of the action]; *Aloha Pacific, Inc. v. California Ins. Guarantee Assn*. (2000) 79 Cal.App.4th 297, 306 [plaintiff's motion for summary judgment denied

26

and parties stipulated to judgment for defendant; appeal proper because consent given to facilitate an appeal].)

Here, as in *McCarthy*, the process followed by the parties in the trial court does not lend itself to an adequate record to review the summary judgment motions filed against Dalin and Vulk. While State Farm filed a separate motion against each of these plaintiffs, which was accompanied by a separate statement of undisputed facts, neither Dalin nor Vulk filed a response to the motion or the separate statement of undisputed facts. Further, neither plaintiff stipulated to the accuracy of the facts recited in State Farm's separate statement of undisputed facts. Instead, the parties stipulated that the facts of the Dalin and Vulk cases are *sufficiently similar* to the facts of Andrighetto's case, such that neither Dalin nor Vulk could "prevail on any of [their] claims based on the adverse determination of critical issues of law in the Court's summary judgment ruling in [the] *Andrighetto* [case]."

The line of cases invoked by State Farm are inapposite to this case. The stipulated judgments in the Dalin and Vulk cases were not entered following a dispositive adverse ruling on a properly litigated motion for summary judgment involving Dalin or Vulk. And the record does not reflect that the Dalin and Vulk appeals merely raise issues of law (decided adversely to them by the trial court in ruling on the motion for summary judgment filed against Andrighetto), to be decided based on a set of undisputed facts. Accordingly, we cannot affirm the stipulated judgments on the basis that the trial court would have granted summary judgment against Dalin and Vulk given its legal rulings in the Andrighetto matter. Applying *McCarthy* to the situation we face here, we must reverse the two judgments and remand for further proceedings. (See *McCarthy*, *supra*, 174 Cal.App.4th at p. 123.)

27

## DISPOSITION

The judgment in the Andrighetto matter is affirmed.

The judgments in the Dalin and Vulk matters are reversed; both matters are remanded for further proceedings.

State Farm is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Mauro, Acting P. J.


_____/s/_____
Krause, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Siskiyou)

----

| | |
|---|---|
| MATTHEW VULK,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>STATE FARM GENERAL INSURANCE COMPANY,<br><br>    Defendant and Respondent. | C090073<br><br>(Super. Ct. No. SC-CV-CV-15-1146-21)<br><br>ORDER GRANTING PARTIAL PUBLICATION |
| GARY ANDRIGHETTO,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>STATE FARM GENERAL INSURANCE COMPANY,<br><br>    Defendant and Respondent. | C090074<br><br>(Super. Ct. No. SC-CV-CV-15-1146-1) |

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

| JAMES DALIN, | C090278 |
| --- | --- |
| Plaintiff and Appellant, | (Super. Ct. No. SC-CV-CV-15-1146-4) |
| v. | |
| STATE FARM GENERAL INSURANCE COMPANY, | |
| Defendant and Respondent. | |

It is hereby ordered:

1.      The opinion in the above-entitled matter filed August 31, 2021, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be partially published in the Official Reports, and it is so ordered.

FOR THE COURT:


_____/s/_____
Mauro, Acting P. J.


_____/s/_____
Duarte, J.


_____/s/_____
Krause, J.

2

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Siskiyou County, Karen Dixon, Judge.  Affirmed in part and reversed in part.

The O'Connor Law Firm and Timothy J. O'Connor for Plaintiffs and Appellants.

LHB Pacific Law Partners, Sandra Elizabeth Stone, and Jenny Jen-Yi Chu; Defendant and Respondent.