Filed 10/21/24  Terrace View Partners v. Three State Investment Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TERRACE VIEW PARTNERS, L.P., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> THREE STATE INVESTMENT COMPANY, <br><br> Defendant and Respondent. | D082477 <br><br><br> (Super. Ct. No. 37-2022-00002918) <br><br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on September 25, 2024 be modified as follows:

1.  On page 18, at the end of the first full paragraph, ending with "provide any authority suggesting the same," add the following as footnote 7, which will require renumbering of all subsequent footnotes:

> **7**    Terrace View asserts Three State could waive its contractual rights by words or conduct despite the plain language of the anti-waiver and integration clauses.  (See *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56).  To effectuate a waiver, a party must

expressly and intentionally relinquish a known legal right or act in a way that is " 'so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' " (*Id.* at p. 78.) Terrace View relies on undisputed written correspondence to support this claim and, for the reasons discussed herein, has not established a triable issue of material fact as to whether that correspondence shows that Three State intended to waive the contingency date in its entirely. (See *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678–679 [waiver may be resolved as a matter of law when the underlying facts are undisputed; pivotal issue is intent of party allegedly waiving its right].) At most, Three State suggested an intent to extend the contingency date for a short period to allow an initial investigation into the title issues. As we discuss, *post*, the undisputed evidence shows no intent by Three State to keep the transaction open indefinitely, with no right to terminate or close the sale until Terrace View chose to approve or disapprove the condition of the property.

2. On page 19, replace the first sentence of the first full paragraph, starting with "Three State's counsel" with the following:

Three State's counsel repeatedly notified Kaplan that it was unilaterally terminating the Agreement, as it had a right to do under section 4.4 if the condition of the property was not waived or approved on or before the contingency date.

3. On page 19, after the second sentence of the second full paragraph, ending with "copy to the escrow agent and the other party," insert the following:

Moreover, to the extent any doubt remained as to the alleged waiver of the contingency date, these communications unequivocally establish that Three State did not intend to waive the contingency date, or its right to terminate if Terrace View did not waive or approve the condition of the property, indefinitely. To the extent Three State expressed an intent to extend the contingency date for a short period to allow for an initial investigation into the underlying issue, it

2

made clear in the April 23, 2009, letter that, given the results of that initial investigation, it did not intend to waive the contingency date any further, or to hold escrow open indefinitely.

There is no change in judgment.

Respondent's petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

Filed 9/25/24  Terrace View Partners v. Three State Investment Co. CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TERRACE VIEW PARTNERS, L.P., | D082477 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2022-00002918) |
| THREE STATE INVESTMENT COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Allen Matkins Leck Gamble Mallory & Natsis and Andrew A. Wood; Scheppach Bauer and Brian R. Bauer for Plaintiff and Appellant.

Seltzer Caplan McMahon Vitek, G. Scott Williams, Richard Gluck and Pj M. Novack for Defendant and Respondent.

Terrace View Partners, L.P. (Terrace View) appeals from a summary judgment granted in favor of Three State Investment Company (Three State). The underlying dispute involves a written agreement (the Agreement) in which Terrace View agreed to purchase a parcel of land (the Property) underlying a mobile home park that Terrace View has operated under a

ground lease from Three State since 1989. During the escrow period, Terrace View learned that Three State had previously sold a .46-acre portion at the edge of the Property to another party years earlier, creating a cloud on the title that prevented the sale from closing as originally contemplated. Thereafter, the County of San Diego (the County) asserted the previous sale violated the subdivision map act, complicating the matter further and requiring years of remediation.

In January 2022, nearly 13 years after the parties executed the Agreement, Terrace View filed a complaint against Three State seeking specific performance under the Agreement. Three State asserted the Agreement had terminated no later than 2015 and the four-year statute of limitations had run on Terrace View's claim. The trial court agreed and granted Three State's motion for summary judgment. On our own independent review, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Three State has owned the Property underlying the present dispute since 1964. In 1969, Three State leased the majority of the Property to Terrace View's predecessor for a term of 55 years, ending on January 31, 2024. In October 1972, Three State agreed to amend the lease to add an additional .46-acre section at the edge of the property for an additional monthly fee. Terrace View took over the lease in 1989 and has operated a mobile home park on the Property since. Terrace View made improvements to the Property over the years and eventually expressed an interest in purchasing it.

### A. *The Parties Execute the Agreement*

The parties executed the Agreement, setting forth the terms of the sale, in February 2009. Terrace View agreed to pay $7.7 million for the Property, and to place a $100,000 deposit in escrow, to be applied to the purchase price

2

at closing.  The parties were to deliver a fully executed copy of the Agreement to the escrow agent, who was then to open escrow by executing a consent of escrow and delivering it to the parties.  The escrow agent did so on February 25, 2009, thereby establishing the effective date of the Agreement.  The Agreement sets a contingency date at 5:00 p.m., 15 days after the effective date (March 12, 2009), and a closing date on or before 30 days after the effective date (March 27, 2009).

The conditions to close escrow are set forth in article 4 of the Agreement.  Section 4.2.1 specifies that Terrace View, as the buyer, had until the contingency date "to approve or disapprove, by written notice to [Three State] and [the] Escrow Agent, the physical condition of the property," including "the title matter described in Article 5."  Alternatively, Terrace View could unilaterally waive the satisfaction of the condition in section 4.2.1.  Section 4.3 provides, "[i]f the condition set forth in Section 4.2.1 is not deemed satisfied or waived, then [the Agreement] shall be terminated and the Deposit shall be refunded to [Terrace View]."  Section 4.4 states further, "[i]f the condition set forth in Section 4.2.1 is not deemed satisfied or waived *on or before the Contingency Date*, then *either* [party] may unilaterally terminate [the] Agreement and the Escrow by giving written notice of termination to [the] Escrow Agent (with a copy to the other party)."  (Italics added.)

Under article 5, Three State was to deliver "a preliminary report for the Property ('PR') issued by Fidelity National Title Company," (Fidelity) within five days of the effective date.  As the seller, Three State warranted that it had "full legal right, power and authority to execute and fully perform its obligations" under the Agreement and, to the best of its knowledge, "no legal actions were pending or threatened against the Property."  If Three State was

3

to learn of anything that would cause it to breach those warranties prior to the closing date, it was to notify Terrace View, and would then have ten days to cure the breach. If Three State was unable to cure, Terrace View could terminate the Agreement or "waive its rights not to consummate the transaction" as contemplated in the Agreement.

Article 17 of the Agreement sets forth additional details regarding the close of escrow. Terrace View was to deliver all funds to the escrow agent, the escrow agent was to procure a title policy with liability in the amount of the agreed upon purchase price, and Terrace View was to complete its due diligence, such that the conditions set forth in article 4, section 4.2.1 were satisfied or waived. Section 17.3 provides, "If Escrow Agent cannot close the Escrow on or before the Closing Date, it will nevertheless close the same when all conditions (except as to time) have been met, unless after the Closing Date and prior to the Close of Escrow, Escrow Agent receives a written demand for termination from a party hereto not then in default hereunder."

Finally, section 18.6 confirms the Agreement contains the entire agreement of the parties, and section 18.6 provides further that "[n]o waiver, modification, amendment, discharge, or change of this Agreement shall be valid unless it is in writing and signed by the party against which the enforcement of the modification, waiver, amendment, discharge, or change is sought."

## B. *Title Discrepancies Arise During Escrow*

The escrow agent delivered the preliminary title report from Fidelity on March 5, 2009. Terrace View noted that there was a discrepancy with the legal description of the Property. Specifically, the Agreement and ground lease included the additional .46-acre segment at the back edge of the Property, but the preliminary title report did not. Upon inquiry, the escrow

4

agent explained that the additional .46 acres, referred to as "Parcel 2" in the lease amendment, was omitted because it was owned by a third party, Centex Homes (Centex). Terrace View indicated that it was not previously aware of the sale to Centex and raised several associated questions and concerns with Three State.

Not long after, Terrace View learned the County had determined the Property was not a legal parcel, because the larger original parcel had been illegally subdivided when Three State sold the parcel containing the .46-acre segment to Centex. The County indicated the principals of Three State, members of the Odom family, had known about the issue since 2003 and had been working to resolve it since 2006. On April 20, 2009, the County issued a notice of intention to record a notice of violation against what it identified as Parcels 1 (A), owned by Three State, and Parcel 2 (B), owned by Centex. The County asserted Three State's conveyance of Parcel 2 (B) in 2003 violated the subdivision map act and stated it would not issue any permits or approvals for either property absent full compliance with the act.

As a result, Fidelity declined to issue the title policy contemplated by the parties in the Agreement. Three State notified Terrace View of Fidelity's position on April 23, 2009, and explained it would not be possible to complete the sale without the title policy. Three State asked Terrace View to contact the escrow holder and request cancellation instructions. Terrace View declined to do so and instead suggested the parties delay closing so Three State could attempt to resolve the issue. It does not appear as though Three State responded directly to that request, but it did continue to work on the title issues, and kept Terrace View informed of its progress. Despite Three State's efforts, the County recorded a formal notice of violation in July 2009.

5

In May 2010, Three State again informed Terrace View that the existing Agreement was no longer enforceable. Three State said it would continue to keep Terrace View apprised of its efforts as a courtesy but clarified that Terrace View should not view those communications "to suggest or admit that there continues to be any binding agreement or commitment between Three State and [Terrace View] for the sale of [the Property]." Rather, if Three State was able to remedy the title and land use issues and Terrace View remained interested in purchasing the Property, the parties could address the terms of such an agreement at that time.

Three State sent another letter later that month, explaining its understanding of the situation in more detail. Three State had deeded the 76-acre parcel of land adjacent to the Property to a related entity, Los Coches Development, LLC (Los Coches),[1] in 2003, and Los Coches then deeded it to Centex in 2005. Fidelity issued a title policy insuring the 76-acre parcel at the time of the 2005 transfer. In doing so, Fidelity concluded the 76-acres parcel was created before the effective date of the subdivision map act and was therefore "grandfathered" as a separate legal lot.[2] Centex learned of some title issues in 2006 in connection with a development application it was submitting, but Three State believed Centex had cleared the issues with the County thereafter.

---

[1] According to Three State, Los Coches was an entity formed by members of the Odom family, the principals of Three State.

[2] Three State later explained that a Deed of Trust containing the correct legal description of the Property was recorded against the leasehold interest prior to the Act.

6

Three State asserted in its May 2010 letter that the parties had made a mutual mistake as to a material fact when they executed the Agreement. It stated, "The terms and provisions of the Agreement are no longer relevant and the Agreement is unenforceable due to a mutual mistake of material fact" as to the legal description of the property and the ability to obtain a title policy for that description. Three State copied the escrow agent on the letter and instructed her to cancel the escrow and return any remaining deposit to Terrace View. For reasons that are not clear in the record before us, escrow was not closed, and the deposit was not returned to Terrace View.

C.      ***Resolution of the Title Discrepancies***

Centex eventually agreed to a boundary adjustment, restoring the .46-acre portion to the Property and resolving the discrepancy in the legal description. In March 2011, Centex, Three State, and the County entered into an agreement whereby the County approved the boundary adjustment and Three State agreed to pay for certain improvements, including a left-turn pocket and easement for street visibility.

That November, the County recorded a Conditional Certificate of Compliance (CCOC) as to the Property, the adjacent 76-acre parcel owned by Centex, and a third adjacent 22-acre parcel still owned by the Odom Family. The County stated it would clear the violation recorded against the first two parcels but would not issue any permit or grant any approval to develop any of the three parcels until certain conditions were met. The conditions included, among other items, an environmental review and certain specified road improvements.

Three State and Terrace View continued to exchange communications over the next several months. In October 2012, Three State informed Terrace View that another individual had purchased the remaining 22-acre parcel,

7

with the intent to build a single-family residence, and agreed to install the road improvements set forth in the CCOC.

In March 2013, Three State sent another letter to Terrace View stating, "The pending escrow with respect to the sale of the Terrace View Mobile Home Park by Three State Investment Company to Terrace View Partners, L.P. is in a condition to be closed. Three State desires to close the escrow at the earliest opportunity." Three State explained how it had now resolved each of the issues raised by Terrace View and suggested the parties meet to inspect the Property and address any unresolved issues. It is unclear whether that meeting occurred. Later that month, Three State provided copies of the agreement with the County and the CCOC to Terrace View, and proposed a solution for an additional concern that Terrace View had raised regarding a potential easement for road visibility.

Escrow was not closed, through a sale or otherwise, and it appears there was then a significant pause in the communications between Three State and Terrace View. Two years later, in July 2015, Three State sent Terrace View a letter confirming that "Terrace View has no right to acquire a fee or any other interest in the Property." Three State reiterated its previous position that the Agreement was null and void, or unenforceable, due to a mutual mistake as to a material fact, and pointed out that Terrace View had not delivered closing documents or taken legal action to enforce its purported right to purchase the Property. Terrace View disagreed and asserted any attempt to terminate the Agreement would be "met with our vigorous defense and in fact, we will have no choice but to assert our claims against [Three State] for the breach of the various obligations it has had to us."

Neither party initiated litigation and, once again, there appears to be a significant gap in communication following the July 2015 exchange.

8

Meanwhile, the various projects aimed at satisfying the conditions set forth in the CCOC continued. In June 2019, the County recorded a certificate of compliance indicating the conditions had been satisfied and the Property had been divided in compliance with the subdivision map act.

In December 2021, Terrace View sent Three State a letter stating it was now able to approve the condition of the Property. In the letter, Terrace View approved the physical condition of the Property, waived any remaining title issues, and demanded Three State comply with its obligations under the Agreement by delivering a grant deed transferring the Property to Terrace View. Three State refused.

## D.  *Litigation*

In January 2022, Terrace View filed a complaint for specific performance against Three State. Terrace View asserted the parties had waived the timing conditions set forth in the Agreement, that it had now approved the physical condition of the Property, and that it was "entitled to specific performance of the terms, conditions, and provisions of the Agreement."

Three State filed a demurrer asserting the claim was barred by the statute of limitations, among other grounds. The trial court overruled the demurrer based on the allegations in the complaint, and Three State filed a motion for summary judgment or summary adjudication on similar grounds.

After briefing and argument from the parties, the trial court granted Three State's motion for summary judgment. The trial court concluded the evidence conclusively established Three State had terminated the Agreement on multiple occasions between 2009 and 2015. Thus, the four-year statute of limitations began to run on or before 2015. The court concluded, "Because this action was not filed until 2022, the limitations period expired and the

9

action is barred." The trial court entered judgment based on the summary judgment.

Terrace View filed a timely notice of appeal.

## II. DISCUSSION

Terrace View contends the trial court erred in granting summary judgment. It argues there was a triable issue of material fact as to when the statute of limitations began to run in the first instance based on evidence it presented showing the parties agreed to waive or postpone the closing date indefinitely. Because of the alleged waiver, Terrace View contends Three State was not in breach of the Agreement and the statute of limitations did not begin to run until it accepted the condition of the Property and sought performance under the Agreement in December 2021. Three State asserts the trial court correctly determined the Agreement terminated in or before July 2015, either automatically or based on any one of at least four instances in which Three State gave express written notice of unilateral termination.

### A. *General Principles and Standard of Review*

A trial court shall grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc. § 437c, subd. (c).)

A defendant moving for summary judgment carries the initial burden of presenting evidence sufficient to establish the plaintiff either cannot prove, or there is a complete defense to, each cause of action alleged in the complaint. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853; *Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) If the defendant meets that burden, it then shifts to the plaintiff to present evidence demonstrating a

10

triable issue of material fact, that is, evidence that would allow a reasonable trier of fact to make a factual finding that is necessary under the pleadings in favor of the party opposing the motion. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at pp. 843, 850.) The trial court does not weigh the evidence and must deny the motion if the evidence, or any inferences reasonably drawn therefrom, raises a triable issue of material fact. (*Aguilar,* at p. 856.)

When a party challenges a trial court's ruling granting summary judgment on appeal, we apply the same legal standard used by the trial court and independently assess the correctness of the ruling. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 231; *Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 326.) "[W]e examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) However, " '[a]s with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.' " (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230; see also *Vulk v. State Farm General Ins. Co.* (2021) 69 Cal.App.5th 243, 253.)

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.) In the absence of conflicting extrinsic evidence, the interpretation of a contract is a

purely judicial function that does not require the weighing of evidence and thus is susceptible to summary judgment. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.) The same is generally true for written communications between the parties concerning the contract.[3] (See, e.g., *Roth v. Malson* (1998) 67 Cal.App.4th 552, 556; *Fry v. Pekarovich* (1975) 46 Cal.App.3d 165, 168; *Richards v. Flower* (1961) 193 Cal.App.2d 233, 235.)

**B.** ***Three State Was Entitled to Summary Judgment***

The trial court found that Three State was entitled to summary judgment because Terrace View's sole cause of action for specific performance under the Agreement was barred by the statute of limitations. The parties do not dispute the trial court's conclusion that the action is based on a written contract and is therefore governed by a four-year statute of limitations. (See Code Civ. Proc. § 337, subd. (a).) Rather, the dispute centers on whether there is a triable issue of material fact as to when the statute of limitations began to run. As we explain, we conclude Terrace View did not present evidence sufficient to raise a triable issue of material fact as to whether the statute of limitations began to run on or before 2015. Accordingly, Three State was entitled to summary judgment.

### 1. The Parties Are Bound by the Express Terms of the Agreement

We begin with the terms of the contract itself. "Contract interpretation presents a question of law which this court determines independently. [Citations.] [¶] A contract must be interpreted to give effect to the mutual,

---

[3]    Terrace View does not contend there is any ambiguity in the Purchase Agreement itself, but in its reply brief, it asserts in passing that there is at least some ambiguity in the written communications between the parties.

expressed intention of the parties.  Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone."  (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 472–473.)

It is undisputed that the effective date of the Agreement was February 25, 2009; the contingency date was 5:00 p.m. on March 12, 2009; and the closing date was March 27, 2009.  It is also undisputed that under section 4.2.1, Terrace View had until 5:00 p.m. on March 12, 2009 "to approve or disapprove, by written notice to [Three State] and [the] Escrow Agent, the physical condition of the [P]roperty;" that the physical condition included the title; and that Terrace View did *not* approve the condition on or before March 12, 2009.  Alternatively, Terrace View could waive the condition of the Property, but neither party contends Terrace View ever did so.

Two similar clauses address the situation in which the condition of the Property as set forth in section 4.2.1 is not satisfied or waived.  Section 4.3 provides:

> "If the condition set forth in Section 4.2.l is not deemed satisfied or waived, then [the Agreement] shall be terminated and the Deposit shall be refunded to [Terrace View]."

Section 4.4 provides further:

> "If the condition set forth in Section 4.2.l is not deemed satisfied or waived on or before the Contingency Date, then either [party] may unilaterally terminate [the] Agreement and the Escrow by giving written notice of termination to [the] Escrow Agent (with a copy to the other party)."

Thus, under the plain terms of the Agreement, if the condition in section 4.2.1 was not deemed satisfied or waived, the Agreement either automatically terminated or was subject to unilateral termination by either party.[4]

Terrace View asserts the foregoing termination clauses were not triggered in the first instance because the parties affirmatively agreed to waive or indefinitely postpone the contingency and closing dates. Terrace View relies on a series of exchanges between the parties between March 10 and July 19, 2009, as evidence of this purported waiver, and asks this court to apply general waiver principals to conclude the exchanges constituted a waiver of the closing date. But when, as here, there is a written agreement, it is the express terms of the agreement that govern. (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 505 [contract provision requiring waiver to be in writing prohibited waiver by conduct]; *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1341–1342 [plain language of the contract controls]; *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 662–663 [a fully integrated contract that prohibits waiver unless by signed writing cannot be orally changed].)

Section 18.5 of the Agreement specifically addresses waiver, and states: "Modifications; Waiver. No waiver, modification, amendment, discharge, or change of this Agreement shall be valid unless it is in writing and signed by the party against which the enforcement of the modification, waiver,

---

[4]     We note that the trial court also relied on section 2.2.1 which provides for automatic termination in the event Terrace View timely *disapproves* the condition of the Property. Because we review the ruling de novo and rely instead on clauses 4.3 and 4.4, we need not and expressly do not address the court's ruling as to section 2.2.1.

14

amendment, discharge, or change is sought."[5]  The term "parties" is not expressly defined in the Agreement.  However, the first paragraph states the Agreement is between Three State and Terrace View, and the Agreement is signed by Thomas B. Odom, as the chief financial officer and secretary of Three State, and Kaplan, as general partner for Terrace View.  Notably, it is not signed by their attorneys.

## 2. Terrace View Has Not Established a Triable Issue of Material Fact as to Whether Three State Waived Time Under the Agreement

With the terms of the written Agreement in mind, we consider the relevant exchanges.  The first exchange occurred over e-mail between March 10 and 12, 2009.  It begins with Jeffrey Kaplan, a general partner of Terrace View and an inactive attorney, raising several questions about the impact of the prior sale of the .46-acre segment.  William Treitler, an attorney that represented Terrace View at the time, responded the next day and explained, "[t]he title company might not have picked up all the relevant documents."  He stated, "[i]t will probably take until early next week before we have all the answers."

Kaplan responded on March 12, the contingency date, stating, "I don't mind waiting for the response since we need to make sure the investigation is correct, but I do want to make sure that *whatever time we have under the Agreement for title approval does not expire until we can consider the impact of whatever the outcome of this investigation may reveal*; and, of course, that

---

5       Section 18.6 of the Purchase Agreement states further: "<u>Entire Agreement</u>.  This agreement contains the entire agreement between the parties relating to the transactions contemplated by this Agreement and all prior or contemporaneous agreements, understanding, representations, or statements, oral or written, are superseded."

none of this constitutes any waiver by us of any rights we have under the Agreement. [¶] Let me know if you disagree with the foregoing." (Italics added.) Treitler responded, "No disagreement. [¶] I don't anticipate hearing anything definitive . . . until next week. [¶] Bill."

Notably, at that point, the issue under discussion was limited to the prior sale of the .46-acre segment at the edge of the Property to Centex, and the parties still had over two weeks until the closing date. At most, Kaplan proposed extending the contingency date or, more specifically, the time Terrace View had to approve the condition of the Property pending the outcome of this initial investigation. Moreover, although Treitler stated, "No disagreement," the exchange occurred over e-mail and no agreement was set forth in a separate writing modifying or amending the Agreement, nor were any of the writings signed by either party.

The initial investigation revealed larger issues with the title, and by late March the parties understood Three State could not transfer the Property to Terrace View until it resolved the alleged violation of the subdivision map act with the County.[6] On March 19, 2009, Kaplan acknowledged it was not realistic to close by April 1. He told Treitler, "I think if we both work together we can get the matter resolved to our mutual satisfaction and, of course, *I understand that nothing contained in your letters and nothing contained herein is intended to waive any rights either of us may have in the existing Purchase Agreement*." (Italics added.)

---

[6]     We acknowledge there is a factual dispute as to how much Three State knew about the alleged violation and when, but we do not find that fact material to the statute of limitations issue currently before us.

16

The parties continued to discuss the timing and, on March 30, 2009, Treitler stated, via e-mail, "For now, I suggest you stand down on moving the money around. If Fidelity will not provide the 116.7 Endorsement then Three State will either need to prevail upon Fidelity to issue the Endorsement or, if there really is a defect, fix it. This will take some time. I should have more info over the next few days. Bill." Kaplan thanked Treitler for the information and reiterated, "consistent with my prior comments, except for this delay in the closing, we have not and do not waive any rights we have under the Purchase Agreement."

On April 23, 2009, Treitler sent Kaplan a signed letter, in which he explained Fidelity would not issue the title insurance policy as contemplated by the Agreement, and therefore "it is not possible to complete the sale and close escrow." He concluded, "My client is not aware of any alternative, at this juncture, other than terminating the escrow," and asked Kaplan to "contact the escrow holder and request that appropriate cancellation instructions be drafted for execution by the parties." Kaplan did not do so, and instead "invite[d Three State] *to consider* discussing with us some alternatives, *such as delaying the closing* until [Three State] can obtain whatever consents or approvals it needs to perform." (Italics added.) Although the parties had been trying to come to some resolution, Kaplan's statement on behalf of Terrace View suggests there was no agreement, let alone a written signed amendment delaying the closing date or otherwise modifying the terms of the Agreement. Rather, at most, Terrace View invited Three State to discuss alternatives.

Treitler sent Kaplan another letter on July 16, 2009. Treitler noted that Three State was continuing to work with the County but they had not yet been able to reach a solution. He said they were working on another

17

strategy and would provide an update as soon as he had "something meaningful to communicate." He concluded, "For now, the Odom Family and their representatives are still working on the problem, and will continue to do so until the problem has been satisfactorily resolved."

Terrace View refers to this letter as the "2009 Resolution Modification" and asserts it was sufficient to meet the requirements of section 18.5 of the Agreement (specifically addressing waivers) because it was in writing and signed by Treitler, Three State's attorney. We are not persuaded. First, as we have already explained, section 18.5 of the agreement plainly states that no "waiver, modification, amendment, discharge, or change" is valid unless set forth in a writing "signed by the party." There is nothing in the plain language of the Agreement to suggest a letter signed by counsel is sufficient, nor does Three State provide any authority suggesting the same.

Regardless, even if the July 2009 letter could be considered a signed writing, it does not amend or modify the Agreement in any way. It merely states that Three State will continue to work on the title issue with the County until it is satisfactorily resolved. An agreement to work on a mutual problem is not an agreement to modify a contract and, again, Three State provides no authority that such a general commitment equated to a waiver or modification of the terms of the Agreement. For these reasons, we agree with the trial court that Terrace View has not established a triable issue of material fact as to whether the parties effectuated a waiver of time, indefinitely extending the closing date.

### 3. The Evidence Conclusively Establishes that Three State Unilaterally Terminated the Agreement

In any event, even if we were to conclude (which we do not) that there was a triable issue of material fact as to whether the written communications between Treitler and Kaplan constituted a waiver or modification of the

18

Agreement such that it did not automatically terminate under section 4.3, we would nevertheless conclude that the evidence establishes, as a matter of law, Three State unequivocally terminated the Agreement under section 4.4.

Three State's counsel repeatedly notified Kaplan that it was unilaterally terminating the Agreement, as it had a right to do under section 4.4 *on or before* the contingency date. In a signed letter dated April 23, 2009, Treitler told Kaplan, "My client is not aware of any alternative, at this juncture, other than terminating the escrow," and asked Kaplan to request cancellation instructions from escrow. That same month, another attorney for Three State wrote Kaplan a letter that provided a detailed history of the title issues. The attorney stated that Three State had asked Kaplan to participate in a plan to resolve the issues and he had refused.

She concluded by stating, in no uncertain terms:

> "The terms and provisions of the Agreement are no longer relevant and the Agreement is unenforceable due to a mutual mistake as to a material fact, the legal description attached is invalid, a failure of various conditions including without limitation those set forth in Section 4.2 relating to 'title matters' and 'laws, ordinances . . . affecting the Property,' and Sections 5.1 and 5.4 relating to a Title Policy with a CLTA 116.7 endorsement, and a failure by both parties to take various actions including to close due to no fault of Seller. [¶] By copy of this letter, *we instruct that Ms. Leslie Hudson, Escrow Agent, cancel the escrow, if any, and return any deposit to you.*" (Italics added.)

As noted, the escrow agent was included in the carbon copy list at the end of the letter.

Terrace View does not dispute the contents of the May 21, 2010 letter, or that a copy was sent to the escrow agent. In our view, this letter was sufficient to invoke the unilateral termination provision set forth in section 4.4, which simply requires written notice of termination with a copy to the

19

escrow agent and the other party. Terrace View asserts the letter can essentially be ignored because escrow remained open and the parties continued to discuss the transaction. But the Agreement does not state that termination occurs when escrow is closed. It states that either party may unilaterally terminate the Agreement by giving written notice of termination to the escrow agent with a copy to the other party. There is no dispute that Three State did that.

Regardless, Terrace View offers no evidence or explanation as to why the escrow stayed open thereafter, and the mere fact that Three State continued to discuss their progress on the title issues and associated projects with Terrace View, the current tenant and still a potential buyer, is not sufficient to effectuate a waiver of their right to terminate the Agreement executed in 2009. To the contrary, Three State expressly informed Terrace View that it was doing so as a courtesy and that Terrace View should not view the communications "to suggest or admit that there continues to be any binding agreement or commitment between Three State and [Terrace View] for the sale of [the Property]."

Finally, on July 8, 2015, after a lengthy period in which there appears to have been little to no communication between the parties, counsel for Three State once again confirmed in writing that:

> "Terrace View has no right to acquire a fee or any other interest in the Property."

The letter went on to reiterate:

> "As we have stated repeatedly, the terms and provisions of the 2009 Agreement are no longer relevant and the 2009 Agreement is null and void, and unenforceable."

The letter further noted that:

20

> "For more than 5 years, [Terrace View had] never taken any legal action to enforce [its] purported right to purchase the Property."

Regardless of any other communications Terrace View may point to, at this point, Three State had terminated the Agreement and had made clear to Terrace View that it had no intention to perform under it. Even if Terrace View did not agree with Three State's position, it could not simply wait until it was ready to either approve the condition of the Property (and insist on purchasing it at the price the parties negotiated in 2009) or initiate litigation. Rather, the statute of limitations had begun.

Attempting to avoid that result, Terrace View also asserts Three State is estopped from asserting the Agreement terminated, or that the statute of limitations began, because it relied on Three State's words and conduct in deciding not to immediately file suit. "[E]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59.) " 'Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) [the estopped party] must intend that [their] conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) [the asserting party] must rely upon the conduct to [their] injury.' " (*Ibid.*) For all the same reasons already discussed, we conclude there is no triable issue of fact as to estoppel because, at least by July 2015, Terrace View was not ignorant of the true state of facts. Three State had clearly communicated its position on numerous occasions and had even expressly stated that Terrace View should not view anything in

21

their ongoing communications as an admission that the Agreement remained enforceable.

Finally, Terrace View relies on *Romano v. Rockwell International, Inc.* (1996) 14 Cal.4th 479 (*Romano*) to assert that "when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract." (*Id.* at p. 489.) *Romano* was a wrongful termination case in which the court addressed whether the statute of limitations began to run when the employee learned that he would be terminated immediately if he did not agree to take a teaching fellowship, or whether it only began to run when his employment terminated, over two years later. (*Id.* at pp. 484–485.)

In that context, the Court explained that when one party states its intention to repudiate a contract before the time for performance has arrived, the other party may elect to " 'treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time.' " (*Romano, supra*, 14 Cal.4th at p. 489.) Accordingly, "*when there are ongoing contractual obligations* the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract." (*Ibid.*, italics added.) Here, there were no ongoing contractual obligations because Three State affirmatively terminated the Agreement, as it was entitled to do under section 4.4. *Romano* is not instructive.

Based on the foregoing, we conclude, on our own independent review that Three State was entitled to summary judgment because the statute of limitations barred Terrace View's claim.[7]

## III.   DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.


KELETY, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

---

[7]    Because we conclude the trial court properly granted summary judgment based on the statute of limitations, we need not address Three State's assertion that specific performance is barred by the doctrine of laches. Accordingly, we hereby deny Three State's request that we take judicial notice of a consumer price index report indicating housing prices have increased since 2009.  (See *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075 [appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal"].)